# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Demaret*, 2012 IL App (1st) 111916

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ELIZABETH DEMARET, Petitioner-Appellant, and JAMES DEMARET Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1916 |
| Filed | January 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent's pending petition for the attorney fees he would incur in connection with petitioner's request to remove the parties' children to New Jersey did not preclude the appellate court from considering petitioner's appeal from the trial court's denial of her request, and upon addressing the merits of petitioner's challenge to the denial, the denial was affirmed based on the appellate court's finding that petitioner failed to show that removal would be in the children's best interests, especially when there was no convincing evidence their quality of life would improve, even though petitioner would earn a higher salary at her new job, the court concluded that the move would increase petitioner's control over the children's lives and could marginalize respondent's relationship with them, respondent's desire to maintain a close relationship with his children weighed against removal, and reasonable visitation could not be maintained. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-D2-30415; the Hon. Raul Vega, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Vincent J. Stark and James M. Buzinski, both of Kamerlink, Stark, McCormack, Powers, LLC, of Chicago, for appellant.

Michael G. DiDomenico, of Lake Toback, of Chicago, for appellee.

Panel        JUSTICE GARCIA delivered the judgment of the court, with opinion. Presiding Justice R. Gordon and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1      After a hearing, the circuit court denied the petitioner's request to remove the minor children from Illinois to New Jersey. In its written decision, the trial court addressed each of the factors required by our case law to assess the best interests of the children in a removal matter, finding that none supported the move. The trial court's decision denying the removal petition was not against the manifest weight of the evidence. Accordingly, the denial of the petition was not against the best interests of the children. We affirm.

¶ 2                       BACKGROUND

¶ 3      Petitioner Elizabeth Demaret and respondent James Demaret were married on April 8, 1996. Four children were born to the marriage: Madelyn, age 14; Catherine, age 13; Thomas, age 12; and Delaney, age 10. The parties divorced in September 2006. The dissolution judgment incorporated a parenting agreement that awarded Elizabeth sole custody, care, and control of the children. James was awarded parenting time every other weekend and every Wednesday evening from 5 to 9 p.m. On weekdays when Elizabeth was out of town for work, James was granted a "right of first refusal" to care for the children during the same evening hours of 5 to 9 p.m. The parties agreed to alternate holidays with the children. James was entitled to two full weeks with the children during the summer and one full week during their Christmas break. At the time the parties divorced, Elizabeth expressed concern over James's alcohol consumption. The parenting agreement included provisions regarding alcohol use during visitation with the children. Neither party ever filed a petition alleging a lack of compliance with the parenting agreement.

¶ 4      On July 6, 2010, Elizabeth filed a petition to move the children from Roselle, Illinois, to Middleton, New Jersey. Elizabeth also sought to increase James's child support in a petition filed September 14, 2010. One day after the start of the hearing on the removal and child support petitions on February 15, 2011, James filed a petition for contribution toward the attorney fees he would incur in conjunction with Elizabeth's removal petition. On June 20,

2011, the court entered an order denying each of Elizabeth's petitions. On June 21, 2011, Elizabeth filed her notice of appeal. At the time of the filing of this appeal, the court had not ruled on James's petition for attorney fees.

¶ 5 The following evidence was presented at the hearing. From March 2001 until July 2010, Elizabeth worked for Arthur J. Gallagher (Gallagher), servicing clients in Gallagher's international operations. In 2007, her gross income was $266,933; in 2008, she earned $293,176; and in 2009, she earned $263,263. Her job required her to travel periodically, both within the country and internationally.

¶ 6 Elizabeth began exploring career advancement opportunities both within and outside Gallagher. She spoke to her manager at Gallagher about advancing within the company. Elizabeth came to understand that to advance, she would have to either take on profit and loss responsibilities within the company or relocate abroad. Running a self-contained unit would allow Elizabeth to remain in the Chicago area. Relocating would mean a permanent move to Singapore.

¶ 7 In December 2009, Elizabeth began exploring an employment lead with Marsh, a company located in New York. Elizabeth knew that accepting a job with Marsh would require that she relocate to the New York area. In June 2010, Elizabeth executed an employment contract with Marsh. She would begin with a gross salary base of $245,000, which would increase to $275,000 upon relocating to the New York area. She would also receive a minimum of $125,000 in a guaranteed bonus and $75,000 in stock options. According to Elizabeth's testimony, her annual salary would be a minimum of $475,000, with the possibility of additional bonuses. After signing the contract with Marsh, Elizabeth informed James of her new employment and her intent to move to New Jersey with the children. She resigned from her job at Gallagher.

¶ 8 In addition to earning more money at Marsh, Elizabeth would be required to travel less than when she worked at Gallagher. Work-related travel would be on a "need driven" basis. While at Gallagher, Elizabeth traveled 30 to 35 times per year. At Marsh, she would travel less often, but her travel would more frequently take her out of the country. Marsh also provided better medical benefits with lower out-of-pocket expenses. Her commute from her anticipated home in Middleton to New York City would be shorter than her Chicago-area commute to Gallagher by approximately 10 minutes. According to Elizabeth, the shorter commute time and reduced travel would give her more time at home with the children.

¶ 9 Elizabeth sold her house in Roselle about three months after signing her employment contract with Marsh at a loss of just over $37,000. She and the children moved to a rental unit in Schaumburg. She began looking for a house in Middleton, New Jersey, that would cost between $400,000 and $500,000. The house would have one bedroom for each child, which is equivalent to the house in Roselle. Living expenses for Elizabeth and the children would be approximately $4,500 per month.

¶ 10 Elizabeth has extended family living on the East Coast. Her parents live five miles from Middleton. She has a sister that lives in Washington, D.C.; the other lives in Iowa. The

children's other grandfather, James's father, lives in Florida. The children visit both sides of the family regularly. In New Jersey, the children would have a nanny or Elizabeth's mother would take care of them when Elizabeth could not be home. In Illinois, the children have a nanny and at times Elizabeth's mother flies in to stay with the children when Elizabeth travels. James also cares for the children in accordance with his right of first refusal. Elizabeth testified that both the children and James are familiar with the Middleton area. It is important to her that the children have a close relationship with their extended family. For that reason, she took the children on a trip to Florida in 2008 during which they visited James's father and Elizabeth's aunt and uncle.

¶ 11    All four children are gifted academically. They all participate in gifted programs at school and the three eldest children attend magnet schools. They all participate in social and extracurricular activities. Elizabeth testified that she recently took Thomas to a Webelos lock-in that James did not attend. The schools hold parent-teacher conferences for the children, which Elizabeth schedules. James has attended some conferences and missed others.

¶ 12    Madelyn is on the verge of starting high school. Elizabeth feels strongly that Madelyn attend an academically strong high school. She would like Madelyn to attend a high school academy in New Jersey. If they remain in Illinois, Madelyn's only option for a similar school would be the Illinois Math and Science Academy (IMSA). IMSA is a boarding school, requiring Madelyn to live away from home. According to Elizabeth, the high school academy in New Jersey is ranked eleventh in the country academically; IMSA is not ranked. Elizabeth admitted that she did not know whether similar academic schools in New Jersey would be available for the three younger children prior to high school.

¶ 13    Madelyn and Thomas have health conditions. Both children see doctors at Children's Memorial Hospital in Chicago. Thomas has a condition called "tethered spine." To date, he has had three spinal surgeries. Both parents were present at all three surgeries; however, Elizabeth testified that James does not take an active role in attending to Thomas's medical needs. James does not attend Thomas's doctor's appointments. He conveys any questions to Elizabeth, which she relays to the doctor and reports the answers back to James. Madelyn has a heart condition, which requires monitoring. Elizabeth testified that her benefits at Marsh would reduce the family's insurance costs. However, her testimony did not address how the proposed move to New Jersey would impact the medical treatment Madelyn and Thomas currently receive.

¶ 14    Elizabeth investigated costs for James's travel should the children relocate to New Jersey. There is a flight from Newark to Chicago every hour between 6 a.m. and 9 p.m. At the time of her inquiry, the cost of a round-trip ticket was approximately $225. Elizabeth testified that Amtrak and Greyhound have schedules "similar" to those of the airlines, but she did not elaborate. Elizabeth has no objection to the children flying unaccompanied to Illinois for James's parenting time. She offered to pay up to $5,000 for travel expenses each year. Elizabeth envisions a visitation schedule similar to the one that is currently in place, but with longer periods of visitation. The children could travel to Illinois during the school year so

long as their school and activities schedules permit. Elizabeth also envisions James traveling to New Jersey on weekends for his parenting time. James could stay at an apartment at Elizabeth's parents' home during his visits. The apartment is separate from the parents' residence, but is contained within the building structure of the house.

¶ 15    On cross-examination, Elizabeth testified that she had "not specifically" spoken to the children about the amount of time they would spend with their father if they moved. Nevertheless, she said that Catherine is opposed to the move because of "social aspects." Thomas is willing to move, but he "wants this done." Elizabeth believes that Madelyn does want to move. Delaney expressed an opinion about the move but Elizabeth did not inform the court of Delaney's opinion.

¶ 16    James lives in Elk Grove Village, Illinois. He moved from Chicago to Elk Grove in 2005 to be closer to the children. James pays a percentage of his salary for child support in accordance with the Illinois guidelines, plus $100 per month for medical expenses. At the time of the divorce, James was unemployed. Shortly thereafter, he secured employment at Online Trading Academy, where he remained until November 2010. In January 2011, James began working at Quantum Capital Investments. At the time the removal petition was filed, James was earning only commission. His gross income has fluctuated dramatically, earning $102,467 in 2008 and $32,819 in 2010. In the year prior to the hearing, his father loaned or gave him approximately $42,000 for living expenses and attorney fees. James's girlfriend also loaned him money. In 2008, when Elizabeth took the children to Florida for spring break, James wanted to exercise his visitation rights but could not afford to and was not able to take time off of work.

¶ 17    According to James, he participates in the children's activities as much as he can; he attends all of the children's activities unless work or travel keep him away. He did not go to the recent Webelos lock-in with Thomas because a back injury prevented him from sleeping on the floor. The lock-in took place during James's weekend for visitation. He agreed that Elizabeth could take Thomas to the lock-in while the three girls stayed with him. According to James, Elizabeth plans all of the children's school activities, and she has failed to inform him of many of the children's activities during the past two years.

¶ 18    James attended all three of Thomas's surgeries. He wants to be more involved with Thomas's appointments, but Elizabeth "did not welcome him at any of the procedures or testing of Thomas." Elizabeth is in charge of planning Thomas's medical procedures, which she schedules without consulting James. She sometimes notifies James about a scheduled medical procedure, but other times she does not. When James is present, Elizabeth expects James to remain in the waiting room to avoid the tension that arises when they are both in the room.

¶ 19    James has often sought additional visitation time, which Elizabeth has refused. During visitation, he takes the children to sports games and other outings. The children see their friends "almost daily." James has several family members in Chicago, and the children see them during his visitation time. He takes the children to school and helps with their homework.

¶ 20        James believes he would lose parenting time if the children moved to New Jersey. His weekend time with the children would be reduced because of the time involved in traveling to New Jersey. He would likely have to spend Friday evening and Sunday evening traveling, which would mean his actual visitation with the children would involve only Saturday and part of Sunday. He does not feel comfortable with the children flying unaccompanied for visitation purposes. Train travel is not a feasible option because of the long travel times. Nor does he believe a normal family environment would exist during visitation with the children in New Jersey. The time with his children at his home in Elk Grove would not be the same should he visit with the children at Elizabeth's parents' apartment. He fears the children might be preoccupied with their grandparents, which would degrade his time with them. Nor would staying in a hotel be a good alternative because he believes hotel stays would not be enjoyable for the children and would not allow him to provide a "normal" family environment. James expressed concern over the loss of his visitation with the children on Wednesdays. He also expressed concern that Elizabeth would be the one to decide whether the children's schedules would allow them to visit him on weekends during the school year. Finally, James said flights to New Jersey would cost between $263 and $300 round trip, to which he would have to add $60 to $100 per day for the cost of renting a car.

¶ 21        The children's representative urged the court to deny the removal petition. She felt the children were "firmly cemented" in Illinois and moving at this point in their lives would be more disruptive than beneficial. According to the representative, moving to New Jersey would not lead to a substantial increase in the quality of life for the children.

¶ 22        In a written decision, the trial court denied Elizabeth's petition to remove the minor children to New Jersey. The court expressed concern with the control Elizabeth exerted over the interaction of the children with James. The court concluded that James's visitation rights would suffer substantially were the move allowed. The court also denied Elizabeth's petition to increase James's child support obligations.

¶ 23        Elizabeth appeals the court's denial of the removal petition only.


¶ 24                                         ANALYSIS

¶ 25        As an initial matter, we address James's contention that we lack jurisdiction to decide this appeal because his petition for attorney fees remained unresolved when Elizabeth filed her notice of appeal. According to James, his unresolved attorney fees petition renders this appeal premature. Elizabeth counters that the attorney fees petition was not set for hearing with the other two petitions for good reason. The attorney fees petition urges a matter wholly unrelated to the issue of removal. Thus, its pendency does not affect our jurisdiction to address whether the best interests of the children were served by the denial of her removal petition. A challenge to our jurisdiction presents a question of law. *In re Marriage of Gutman*, 232 Ill. 2d 145, 150 (2008).

¶ 26        The Third District recently addressed the split in authority on this jurisdictional question. Four districts of the appellate court disagree on "whether postdissolution petitions [should

-6-

be] construed as new actions or as new claims within the original dissolution proceeding." *In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091, 1095 (2011). If a postdissolution petition is simply a new claim within the original dissolution proceedings, then the appellate court would not have jurisdiction to entertain a final decision on that petition while another postdissolution petition remained pending, absent a finding by the circuit court under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). See *In re Marriage of Alyassir*, 335 Ill. App. 3d 998 (2d Dist. 2003); *In re Marriage of Gaudio*, 368 Ill. App. 3d 153 (4th Dist. 2006). On the other hand, if the postdissolution petition under consideration is construed as a separate action from the original dissolution proceeding, then appellate court jurisdiction exists upon a final resolution of that petition under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994), regardless of the pendency of an unrelated petition. See *In re Marriage of Carr*, 323 Ill. App. 3d 481 (1st Dist. 2001); *A'Hearn*, 408 Ill. App. 3d at 1098.

¶ 27     In the First District case of *Carr*, the former husband filed a petition to modify the amount of child support when a covered child turned 18 and entered college. *Carr*, 323 Ill. App. 3d at 482. Following the court's resolution of the petition to modify child support, each party filed a motion to reconsider. While the reconsideration motions were pending, the former wife filed a "petition for contribution for attorney fees." *Id*. at 483. On August 27, 1999, the circuit court granted the husband's motion to reconsider and denied the wife's. On October 4, 1999, the wife filed a petition for rule to show cause, alleging nonpayment of the child's college expenses. The appeal was filed after an agreed order was entered on March 9, 2000, regarding the college expenses to be paid by the husband and his contribution to the wife's attorney fees. *Id*. In her appeal, the wife challenged the August 27, 1999 order.

¶ 28     On our own motion, we dismissed the wife's appeal as untimely. *Id*. at 483-85. We held that the circuit court's resolution of the cross-motions for reconsideration of its ruling on the petition to modify child support constituted a final judgment. *Id*. at 484. "The trial court rendered its decision on the motions for reconsideration on August 27, 1999. At this time, the trial court's order fully and finally disposed of [the husband's] petition to set child support and it determined the litigation on the merits." *Id*. at 485. When the wife waited until the agreed order was entered on her petition for rule to show cause and her petition for contribution of attorney fees on March 9, 2000, to challenge the order modifying child support, her appeal was untimely under Illinois Supreme Court Rule 303(a)(1) (eff. May 30, 2008). *Id.* We reasoned that the issues raised in the petition for fees and college expenses were unrelated to the issue of whether the child support payments should be modified. *Id.*

¶ 29     Two years later, the Second District in *Alyassir* disagreed with our holding in *Carr*. *Alyassir*, 335 Ill. App. 3d at 1000. In *Alyassir*, the former wife filed a single postdissolution petition with two counts. *Id.* at 999. One count sought increased child support, while the other sought a rule to show cause based on the former husband's failure to contribute to medical bills. *Id.* The trial court ruled against the wife on the first count. She filed a notice of appeal without dismissing or getting a ruling on the second count. *Id.* The Second District held the trial court's child support ruling on count I was not appealable because the second count of the petition remained pending. *Id.* at 1001. The *Alyassir* court rejected the holding in *Carr*, concluding that if an appeal on fewer than all claims pending were allowed with no

Rule 304(a) finding, the circuit courts would be stripped of discretion to determine when immediate appeals are permitted as the language of the rule clearly provides. *Id.* at 1000-01. The Fourth District agreed with *Alyassir*'s reasoning under similar facts in *In re Marriage of Gaudio*, 368 Ill. App. 3d 153, 157-58 (2006).

¶ 30     Two years after *Gaudio*, the supreme court issued its decision in *Gutman*, 232 Ill. 2d 145. In *Gutman*, the trial court ordered the husband to pay maintenance for three years, beginning in July 1999. *Id.* at 147. On June 21, 2002, the wife filed a petition to continue maintenance. *Id.* In response to a court order directing the husband to continue making maintenance payments until the court resolved the wife's petition, the husband filed a cross-petition to terminate maintenance. *Id.* at 147-48. While the opposing petitions where pending, the wife filed a contempt petition based on the husband's failure to make maintenance payments as directed by court order. *Id.* at 148.

¶ 31     At the scheduled hearing on the cross-petitions regarding maintenance, the wife failed to appear. The circuit court granted the husband's petition to terminate maintenance and dismissed the wife's contempt petition. *Id.* The court later vacated both judgments on the wife's motion. *Id.* When the wife failed to appear at the second hearing on the cross-petitions, the circuit court entered an order on June 23, 2005, terminating the husband's maintenance obligation; the order did not address the contempt petition; nor did the order contain a Rule 304(a) finding. *Id.* The wife's motion of July 23, 2005 to vacate the June 23, 2005 order was denied. Thirty-five days after the wife's motion to reconsider was denied, she filed an appeal, which the appellate court dismissed as untimely. *In re Marriage of Gutman*, 376 Ill. App. 3d 758, 759 (2007).

¶ 32     The supreme court affirmed the dismissal order, but on the basis that the appellate court lacked jurisdiction to entertain the appeal because the former wife's contempt petition remained pending before the circuit court when she filed her appeal. *Gutman,* 232 Ill. 2d at 151. The supreme court ruled that the contempt petition for nonpayment of maintenance was sufficiently related to the cross-petitions on maintenance that a ruling on the contempt petition was required to render the ruling on the maintenance cross-petitions final and appealable. *Id.* at 152-54. The contempt petition for nonpayment of maintenance could not be treated as independent of the maintenance cross-petitions. *Id.* The court limited its examination of precedent to cases concerning contempt petitions. *Id.* The court did not discuss *Carr*.

¶ 33     After *Gutman*, the Third District issued its decision in *A'Hearn*. The *A'Hearn* court concluded that *Gutman* did not resolve the split of authority between *Carr* and *Alyassir* because the supreme court accepted the appellate court's characterization "that the petition for a rule to show cause was a 'part' of the underlying proceeding and consequently represented an unresolved claim that prevented appellate jurisdiction." *A'Hearn*, 408 Ill. App. 3d at 1098 (citing *Gutman*, 232 Ill. 2d 145). In fact, the *Gutman* appellate court treated the appeal as addressing a "final judgment as to all claims 'for relief' in the dissolution action" under Rule 304(a), even though her petition for contempt remained pending before the circuit court. *Gutman*, 376 Ill. App. 3d at 759. As the *A'Hearn* court observed, the

supreme court in *Gutman* concluded that the "unresolved claim *** prevented appellate jurisdiction without a Rule 304(a) finding by the trial court." *A'Hearn*, 408 Ill. App. 3d at 1098. The supreme court never addressed whether a *Carr*-type postdissolution petition constitutes a final judgment under Rule 301, even in the face of an unresolved but unrelated petition pending before the circuit court.

¶ 34    James argues that *Gutman* "effectively overruled" *Carr*. We disagree.

¶ 35    We agree with the Third District that *Gutman* did not resolve the fundamental conflict of whether postdissolution petitions should be treated as new claims of the original dissolution action, mandating a Rule 304(a) finding when fewer than all pending petitions are resolved, or as separate actions under Rule 301, if the pending petitions are not related. We agree with *A'Hearn* "that postdissolution proceedings are generally new actions."[1] *A'Hearn*, 408 Ill. App. 3d at 1097. In fact, as the *A'Hearn* court observed, "Postdissolution proceedings may well continue a decade or more after the divorce decree is entered."[2] *Id.* at 1098. After the marriage has long been dissolved, characterizing a distinct postdissolution proceeding, such as a removal petition, as a new action "upholds the trial court's intent in entering a dispositive order." *A'Hearn*, 408 Ill. App. 3d at 1097. This is especially true when the dispositive order concerns a decision by the trial court based on the best interests of the children. *Id.*

¶ 36    We concur with *A'Hearn* that no conflict exists between *Gutman* and *Carr*. *Gutman* should be read consistent with its facts. In *Gutman*, an immediate appeal from a ruling on a petition regarding court-ordered payments was held to be premature when a contempt petition grounded on the failure to make those payments remained unresolved. *Carr*, on the other hand, permits an immediate appeal when the petition ruled upon is wholly unrelated to the petition that remains pending. Until the supreme court addresses the conflict directly, we decline to read *Gutman* as resolving a conflict that it never addressed.

¶ 37    We also note that the rule in *Carr* would not have changed the outcome in *Alyassir*, where the wife sought to appeal the denial of count I of her petition, but never dismissed or obtained a ruling on count II of the same petition. As the court in *A'Hearn* explained, the rule

---

[1]Such a view is consistent with the observation made by the Fifth District in *Gaudio*: "A petition for dissolution advances a single claim–dissolution of the parties' marriage." *Gaudio*, 368 Ill. App. 3d at 156 (citing *In re Marriage of Leopando*, 96 Ill. 2d 114, 119 (1983)). Once the marriage is dissolved, there is little reason to treat all postdissolution petitions as a continuation of a claim already resolved.

[2]We note that Illinois Supreme Court Rule 304(b)(1) (eff. Jan. 1, 2006) permits an appeal "entered in the administration of an estate *** which finally determines a right or status of a party," even though no final settlement has been reached, because of the lengthy procedure of estate administration. See *In re Estate of Pawlinski*, 407 Ill. App. 3d 957, 962 (2011). Given the protracted nature of postdissolution proceedings, a similar rule may be the most efficient way to resolve the conflict between the Districts on when immediate appeals may be taken from dispositive orders on postdissolution petitions.

in *Carr* is meant to advance the interest of justice. It permits review of a dispositive order that under the rule advocated by *Alyassir* and *Gaudio* could be thwarted by the opposing party "simply by filing a separate, completely unrelated petition." *A'Hearn*, 408 Ill. App. 3d at 1098. Thus, the rule in *Carr* has no application to the facts in *Alyassir* where the party seeking an immediate appeal is also the party that filed the claim that was left pending before the circuit court.

¶ 38     In accordance with our own precedent, we conclude that James's petition for attorney fees was wholly unrelated to the issues presented in the removal petition. The circuit court's written order was a judgment on the issue of removal. The attorney fees issue has no bearing on the circuit court's clear intent to issue a dispositive order regarding the best interests of the children.[3] Hence, we address the merits of Elizabeth's challenge to the circuit court's denial of her removal petition.

¶ 39                                        Removal

¶ 40     Elizabeth contends the circuit court's denial of her removal petition was against the manifest weight of the evidence and the best interests of the children.

¶ 41     Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) states in broad terms when a custodial parent may remove children from Illinois to another state.

> "The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2008).

¶ 42     In considering a removal petition, the circuit court should hear all relevant evidence. *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). Each removal case is *sui generis*. *Id.* While the facts of the case should drive the circuit court's decision on removal, the court is required to address several guiding factors: (1) the likelihood the move will enhance quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking removal and whether it is merely a ruse to frustrate visitation; (3) the motives of the noncustodial parent in resisting removal; (4) the effect of the move on the noncustodial parent's visitation rights; and (5) whether a realistic and reasonable visitation schedule can be reached if the court allows removal. *Id.* at 326-27. In assessing the best interests of the children, the circuit court has discretion to consider other relevant factors. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 523 (2003). No single factor is determinative on the removal question and the weight the circuit court ascribes to each may vary according to the

---

[3]Elizabeth originally filed this appeal under Illinois Supreme Court Rule 311(a) (eff. Feb. 26, 2010), which provides for an expedited appeal in matters involving child custody. On motion of James, we agreed that child custody was not involved to trigger the expedited schedule under Rule 311(a).

circumstances of the case at hand. *Collingbourne*, 204 Ill. 2d at 523. In assessing best interests, the circuit court should keep in mind two salient considerations. First, "a child has an important interest in 'maintaining significant contact with both parents following the divorce.' " *Id.* at 522 (quoting *Eckert*, 119 Ill. 2d at 325). Second, the quality of a child's life may be enhanced from the child's experience "stemming from the [custodial] parent's life enhancement." *Id.* at 526.

¶ 43     A circuit court's decision on removal is entitled to substantial deference because the judge, as trier of fact, directly observes the parties from which he or she can " 'evaluate their temperaments, personalities, and capabilities.' " *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)). A court of review will reverse only if the appealing party can demonstrate that the decision is against the manifest weight of the evidence such that the ruling constitutes a manifest injustice. *Eckert*, 119 Ill. 2d at 328. "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007) (citing *In re Marriage of Main*, 361 Ill. App. 3d 983, 989 (2005)).

¶ 44     We review each of the *Eckert* factors in light of the evidence heard by the circuit court to address Elizabeth's challenge.

¶ 45     As to the first factor–improvement of quality of life for the children and custodial parent–the court stated it was "not convinced" that any improvement would result from removal. The court noted that the home in which Elizabeth and the children would live in New Jersey would be very similar to their home in Illinois. Elizabeth's commute would be very similar. The court noted that no information was presented on the academic programs in New Jersey for the three non-high-school-aged children. The court found that IMSA was an option comparable to the high school in New Jersey that Elizabeth identified. Ultimately, the court concluded that academic life for the children would not improve by a move to New Jersey. While Elizabeth's salary did increase substantially with her move to Marsh, the court noted that the salary Elizabeth earned at Gallagher adequately provided for the children.

¶ 46     Given the quality of life the children have in Illinois, as noted by the children's representative, there is little evidence in the record that their lives would improve with a move to New Jersey. While it is true, as Elizabeth points outs, that removal to New Jersey would place the residency of the children closer to Elizabeth's parents, Elizabeth's mother had traveled to Illinois to watch over the grandchildren during Elizabeth's extended trips. In Illinois, the children were closer to their aunts and uncles on their father's side of the family. Elizabeth's claim that the children would benefit by attending better schools in New Jersey is not borne out by the evidence. The only educational information presented concerned the high school academy Madelyn would likely attend. We do not find it unreasonable for the trial judge to conclude that IMSA was a valid equivalent for the high school in New Jersey. Nor was the trial court presented with any information about programs in New Jersey similar to the gifted programs the younger children attend in Illinois.

¶ 47     Elizabeth also contends that the children would benefit from a move to New Jersey because a shorter commute time and less work-related travel would give her more time to

spend with the children. However, the evidence on both points was conflicting. The trial judge determined that her commute in Illinois is 80 minutes while her commute in New Jersey would be 70 minutes. We have no reason to disagree with the circuit court's conclusion that a 10-minute reduction in travel time does not qualify as an improvement in the quality of life of the children when the children would likely experience a reduction in the time spent with their father. Likewise, Elizabeth's claim that her job with Marsh entails less time traveling is unsupported by the evidence. As the circuit court noted, her trips might be less frequent, but her trips would more often take her out of the country, leading to longer periods of time away. The court noted that in the four weeks leading up to the hearing, Elizabeth left the country for work three times. In the six months prior to hearing, she left the country seven times. The court concluded that her job with Marsh still entailed significant time away from the children. And in Illinois, work-related trips by Elizabeth gave James the opportunity to spend additional evening hours with the children, something that could not happen in New Jersey.

¶ 48    The evidence demonstrated that the living situation for the children in New Jersey would be very similar to the situation they had before their move to Schaumburg. In the Roselle home, each child had his or her own room. Whether in Illinois or in New Jersey, Elizabeth would have to rely on a nanny or babysitter whenever her work kept her away from home. In recent months, James was provided with longer visitation with the children because Elizabeth agreed to allow the children to stay with James overnight instead of hiring a babysitter. On other occasions, Elizabeth arranged for her mother to fly to Illinois from New Jersey to watch the children. Thus, the only change to this aspect of the living situation upon a move to New Jersey would be to diminish the time James could care for the children during the week.

¶ 49    The one major advantage in favor of moving to New Jersey is Elizabeth's higher salary. She testified that she would use her additional salary and bonuses to pay for college expenses. The trial judge characterized Elizabeth's claim of additional savings for college expenses based on her increased salary as "self-serving" given that Elizabeth earned a substantial salary while at Gallagher. Elizabeth argues that she is the sole source of financial support for the children as James makes only small contributions; even if this is true, she has not shown that she was unable to support her children during her employment at Gallagher. In other words, leaving her job in pursuit of more money for the children was not a necessity. Although the trial judge's statement that Elizabeth's most recent gross income at Gallagher of $263,000 is "substantially similar" to her base earnings of $475,000 at Marsh is questionable, the trial judge reasonably concluded that a higher salary alone is not enough to favor removal on the first factor.

¶ 50    The circuit court's determination that the first *Eckert* factor weighed against removal is consistent with the evidence presented.

¶ 51    The second factor looks to the motives of the custodial parent in seeking removal. *Eckert*, 119 Ill. 2d at 327. The trial court stated "that [Elizabeth's] motives for removal stem[med] from her desire to control all aspects of the children's lives, without regard for the rights of Mr. Demaret." The court pointed to the testimony that Elizabeth sought to make decisions

for the children with little or no consultation with James. The court noted that Elizabeth voluntarily resigned from Gallagher, where she could have remained to avoid the upheaval in the lives of the children and their relationship with their father.

¶ 52    The trial court expressly found that Elizabeth dominated every decision in the children's lives and their interactions with James. The court found that Elizabeth excluded James from doctor's appointments and instructed him to stay in the waiting room while she visited Thomas in the hospital. Elizabeth often gave James less than 24 hours' notice to exercise his right of first refusal when she traveled. The trial court concluded that approving the children's move to New Jersey would increase Elizabeth's control over the children's lives, which could marginalize James's relationship with them. According to the court, the poor communication and cooperation between Elizabeth and James might further deteriorate if the distance between the parents were substantially increased. The trial court, as trier of fact, was in the best position to assess the temperament and motivation of each party. There is no basis to overturn the trial court's assessment as to the second factor.

¶ 53    The third *Eckert* factor looks to the motives of the noncustodial parent in opposing removal. *Id.* The trial court found that James had genuine motives for opposing removal, a finding that Elizabeth does not contest on appeal. James's desire to maintain his close relationship with frequent visitation with the children is amply demonstrated by the record. This uncontested factor weighs against removal.

¶ 54    The fourth *Eckert* factor explores the effect that removal would have on the visitation rights of the noncustodial parent. *Id.* The trial court expressed little doubt that James's visitation would be frustrated by the move. Nor was the court swayed that Elizabeth's proposed visitation schedule would substantially preserve the same visitation rights James had in Illinois. Longer weekends to compensate for the missed visitation on Wednesdays would be difficult to put into practice given James's work schedule and the likely school schedule for the children. Nor would the extra week during the summer be an adequate replacement for James's reduced time with the children every Wednesday that he currently exercises.

¶ 55    In her brief, Elizabeth insists that the parties could maintain a visitation schedule reasonably similar to their current schedule. This claim is not borne out by the evidence. Even if Elizabeth and James had a cooperative relationship, it would be highly unlikely that a visitation schedule similar to the existing one could be put into practice with James in Illinois and the children in New Jersey. As James testified, he would have to spend much of Friday evening and Sunday evening traveling, which would substantially curtail his weekend visitation with the children.

¶ 56    Elizabeth argues that "longer blocks of time" could make up for losing time on Wednesdays and the visitation time lost to travel. The trial judge rejected Elizabeth's proposal that an extra week over the summer could make up the visitation time James would lose were the children living in New Jersey. Elizabeth's proposal that James travel to New Jersey on Thursday evening, which she claims is possible because he works from home, is simply unreasonable. Though she faults James for being "unwilling to make any compromises" by refusing to agree to this plan, we agree with the circuit court that it is

Elizabeth's proposed visitation plan that is unrealistic. Elizabeth's assertion that James would be able to spend the same amount of time with the children if only he were more flexible is unsupported by the record.

¶ 57   Nor would the quality of time James would spend with the children in New Jersey, were the move approved, be as good as in Illinois. Elizabeth's proposal that James stay at her parents' apartment could not substitute for a "normal" home environment James provides in Illinois. James also worried that the living arrangement might lead to less visitation time with the children given that the apartment is part of the grandparents' home. The court expressed concern that the apartment arrangement might result in greater control by Elizabeth over the relationship James has with the children. According to James, weekend stays in a hotel would be little better. James nonetheless testified that hotel stays would prevent him from spending time with his children like a "normal family." The court found that both the quantity and quality of visitation time between James and the children would be reduced by a move to New Jersey. The circuit court's assessment of the fourth factor is consistent with the evidence.

¶ 58   The fifth *Eckert* factor looks to whether the parties can maintain a reasonable visitation schedule. The trial court stated that Elizabeth "does not appear willing" to work with James to maintain regular visitation. The court noted that communication problems existed between Elizabeth and James. In the court's assessment, Elizabeth had demonstrated a desire and the ability to control James's interactions with every aspect of the lives of the children. Removal would only give Elizabeth greater control. Ultimately, the court concluded that a reasonable visitation schedule in New Jersey was never offered by Elizabeth. The court found that James would almost certainly have less visitation time with the children if removal were allowed.

¶ 59   Elizabeth argues she was willing to cover some of James's travel expenses to permit a similar visitation schedule as they had in Illinois. However, the cost of travel alone undermines this claim. While Elizabeth claims she is "open to further discussions on the matter" of travel expenses, her only offer was to provide $5,000 for travel expenses. At the lower fare of $225 round-trip that she presented, her offer would only cover 22 round-trip tickets for James and the four children per year. If all four children traveled together, the offer would only cover five trips to Illinois. Even if James were the only one to travel to New Jersey (something unlikely given alternating holidays, winter, spring and summer vacations), the rental car expenses of $60 per day could possibly reduce the trips covered by an allowance of $5,000 to 12 or 13. A similar visitation schedule appears highly unlikely given that James's current visitation schedule covers every other weekend, Wednesday nights, and an opportunity to care for the children should Elizabeth be away for a night.

¶ 60   We acknowledge that reduced visitation by the noncustodial parent may be an unavoidable consequence whenever a removal petition is allowed. In granting a removal petition, the trial judge may conclude that the improvement in the quality of life for the children tips the best interests scale in favor of removal even if it means that the noncustodial parent will have less visitation time, a decision by the trier of fact that would be entitled to substantial deference. *Collingbourne*, 204 Ill. 2d at 523. However, no such decision was made in this case.

¶ 61    The circuit court, in denying Elizabeth's removal petition, concluded that a reasonable visitation schedule from James's perspective could not be maintained. "This Court does not believe that a realistic and reasonable visitation schedule can be reached if the move is allowed because Mrs. Demaret does not appear willing to do it." Even if the record evidence is not so clear, this factor, at best, is neutral. It does not favor removal.

¶ 62    Finally, Elizabeth argues the fourth and fifth *Eckert* factors were left unaddressed by the circuit court. As we quoted above, the court's written order is to the contrary on the fifth factor. As for the fourth factor–the effect of removal on visitation rights–while the court did not set forth its express decision on this factor, it discussed all the relevant facts. Nor does Elizabeth direct our attention to any evidence on the fourth factor that was not considered by the trial judge in his written decision.

¶ 63    The circuit court discussed each of the *Eckert* factors in rejecting Elizabeth's removal petition. The circuit court's decision to deny Elizabeth's removal petition is consistent with the manifest weight of the record evidence.

¶ 64                                   CONCLUSION

¶ 65    On the record before us, Elizabeth has failed to meet her burden that the circuit court's assessment of each of the *Eckert* factors was contrary to the manifest weight of the evidence. Elizabeth has failed to show that removal of the children from Illinois to New Jersey was in the best interests of the children. We affirm the circuit court's ruling.

¶ 66    Affirmed.