2022 IL App (2d) 210739-U
No. 2-21-0739
Order filed October 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF MATTHEW ZYSKOWSKI, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 18-DV-1015 |
| NOELIA ZYSKOWSKI, a/k/a Noelia Donamaria, | ) ) ) | Honorable Jeffrey L. Hirsch, |
| Respondent-Appellant. | ) ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Brennan and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: In postdissolution proceedings concerning a marital settlement agreement (MSA), the trial court did not err in holding respondent in indirect civil contempt for entirely depleting a securities investment account that the MSA directed be divided between the parties. The trial court also did not err in declining to hold petitioner in indirect civil contempt for failing to cooperate in preparing a QDRO for the division of a retirement account. Since the QDRO had been completed before the hearing on the petition for a rule to show cause, a civil contempt finding would be inappropriate because petitioner would have no means to purge himself of the contempt.

¶ 2    In this post-dissolution proceeding, Matthew Zyskowski (petitioner), and Noelia

Zyskowski (a/k/a Noelia Donamaria) (respondent), each filed a petition for a rule to show cause

as to why the other party should not be held in indirect civil contempt for failing to comply with certain provisions of the parties' marital settlement agreement (MSA). Following a hearing, the trial court granted petitioner's petition, finding respondent in indirect civil contempt, and denied respondent's petition. After that, the court denied respondent's motion for reconsideration. On appeal, respondent argues that the trial court erred (1) in finding her in indirect civil contempt, because the provision of the MSA that she was alleged to have violated was ambiguous and unenforceable; and (2) in refusing to find petitioner in indirect civil contempt, because he violated the terms of the MSA by refusing to cooperate in respondent's efforts to obtain a qualified domestic relations order (QDRO) for one of his retirement accounts. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On April 30, 2020, the trial court entered a judgment dissolving the parties' marriage. The judgment of dissolution incorporated the parties' MSA. The MSA contained the following provisions concerning the financial accounts at issue here.

¶ 5     Section 10.1 governed the division of petitioner's "PNC Roth IRA" (the Roth IRA), which had an approximate balance of $49,800.01. It provided that respondent was "entitled to one half (50%) of the *marital portion* of said IRA account and such shall be transferred to her pursuant to QDRO within ninety (90) days of entry of the Judgment for Dissolution of Marriage." (Emphasis in original.)

¶ 6     Section 10.2 governed the division of petitioner's "Barclay 401(k)" (the Barclay 401(k)), which had an approximate balance of $218,206.86. It similarly provided that respondent was "entitled to one half (50%) of the *marital portion* of said 401K account and such shall be transferred to her pursuant to QDRO within ninety (90) days of entry of the Judgment for Dissolution of Marriage." (Emphasis in original.)

¶ 7 Section 10.4 governed the parties' "Joint E*Trade Securities Investment Account" (the joint E*TRADE account), which had an approximate balance of $6,725.69. It provided: "Each Party is entitled to one half (50%) of said account and such shall be split pursuant to the QDRO within ninety (90) days of entry of the Judgment for Dissolution of Marriage."

¶ 8 Section 10.5 addressed QDROs. Subsection "i" provided, *inter alia*, that "[e]ach party shall be financially responsible for any QDRO herein that is for his or her respective benefit, and they shall utilize any attorney of his or her choice." Subsection "v" provided, *inter alia*, that "[b]oth parties shall cooperate in the drafting and execution of any and all QDROs necessary to effectuate the agreement of the parties as stated herein, and absent approval by the Plan(s), said QDROs shall be entered within ninety (90) days of entry of the Judgment for Dissolution of Marriage."

¶ 9 On August 24, 2020, petitioner filed a "Petition to Issue a Rule to Show Cause: Failure to Comply with [the MSA]" against respondent. Petitioner alleged that, under the MSA, the parties were to equally divide the joint E*TRADE account. According to petitioner, "[o]n or about June 23, 2020, [respondent] unilaterally sold all stocks in the E*Trade account and transferred, withdrew, or otherwise absconded with all funds contained in said account: $7,131.07." (Emphasis in omitted.)

¶ 10 On September 8, 2020, respondent filed a "Petition for Rule to Show Cause Seeking Indirect Civil Contempt: Failure to Comply with the [MSA]" against petitioner. The petition contained three counts. As is relevant here, count I alleged that, under the MSA, respondent "was entitled to one-half of the marital portion of [the] Roth IRA and [the] Barclay 401(k), within 90 days from the entry of the judgment[.]" According to respondent, she asked petitioner several times to divide the accounts, but he refused.

¶ 11    On September 10, 2020, the trial court issued a rule to show cause on each petition. The court granted the parties 21 days to respond. The trial court set the matter for status on October 21, 2020.

¶ 12    On September 30, 2020, respondent responded to petitioner's petition. Respondent admitted to the allegation that she liquidated the joint E*TRADE account but stated that she "had to liquidate the only joint account she had access to (the E*Trade Account), to pay the joint marital expenses."

¶ 13    On that same day, petitioner responded to respondent's petition. Petitioner admitted that he had not divided his retirement accounts since the entry of the judgment of dissolution. However, he denied that (1) respondent requested him to "divide his retirements accounts," (2) he "has refused to take any action concerning the division of his retirement accounts," and (3) "any of his actions to date have been to willfully and contumaciously disregard the [MSA]." In addition, as an affirmative defense, he raised the following provision in the MSA: "Each party shall be financially responsible for any QDRO herein that is for his or her respective benefit, and they shall utilize any attorney of his or her choice."

¶ 14    The hearings on the petitions did not occur until over ten months later. In the meantime, on December 17, 2020, respondent filed a motion for entry of a QDRO for the Barclay 401(k). She asked the trial court to enter the QDRO and order petitioner to sign all necessary documents. She also asked for attorney fees in connection with the matter. On December 22, 2020, petitioner filed a response and an objection to the proposed QDRO, arguing that the proposed QDRO included certain nonmarital portions of the Barclay 401(k). The court ordered the parties to prepare legal memoranda. The court held hearings on the motion on December 23, 2020, January 29, 2021, and March 4, 2021. (No reports of proceedings from those hearings are in the record on appeal.)

¶ 15    On March 30, 2021, the trial court granted respondent's motion to enter the QDRO for the Barclay 401(k). The court found that "the 'marital portion' of [the] Barclay 401(k) plan account shall be defined as the account value on the date of dissolution on April 30, 2020, less its value on the date of marriage on June 14, 2008, plus any gains or losses attributable thereon until transferred." The court stated: "Petitioner's objection to the QDRO is overruled and his request to introduce parol evidence is denied." At the conclusion of the hearing, respondent's counsel reminded the court that the petitions for a rule to show cause were still pending and that there was "another retirement account that is still to be divided, ***, and that's the [Roth IRA] account." Counsel stated that she would try to "work through" the petitions with petitioner's counsel. The court indicated that it would address the status of the petitions at the next court date.

¶ 16    The hearing on the petitions for a rule to show cause eventually took place on August 12, 2021. The trial court first addressed petitioner's petition. At the outset, respondent's counsel conceded that respondent withdrew the entire balance of the parties' joint E*TRADE account. The court stated:

"All right. So based upon the pleadings and the admission that [respondent] has withdrawn the entire amount from the joint E*Trade account, the Court does find that's sufficient evidence, at least to show a violation of the underlying judgment.

The burden will shift to her to show cause (indiscernible) why she should not be held in indirect civil contempt of court."

¶ 17    Respondent testified, in relevant part, that (1) the parties owned a home in Texas, (2) there were expenses due for that home, (3) petitioner was responsible under the MSA for one-half of those expenses, (4) she had reached out to petitioner concerning the expenses, (5) petitioner never

responded, and (6) she withdrew the funds from the joint E*TRADE account to pay those expenses. On cross-examination, the following exchange occurred:

"Q. [(PETITIONER'S COUNSEL)]: Okay. With regards to paragraph 10.4 [in the MSA], which I'll screen-share with the Court at this time, you see this highlighted portion that's here, [respondent]?

A. Yes.

Q. And in this paragraph 10.4 here it says that: This account has approximately $6,725.69 at the time that you were divorced, correct?

A. Yes.

Q. And it says in paragraph 2 here:

Each part is entitled to one-half of said account and shall be split pursuant to a QDRO within 90 days of entry of the judgment for dissolution of marriage; is that correct?

A. No, that's actually incorrect. Because this is—I mean, that was written that way, but that is incorrect. There's no QDRO for an E*Trade account, so that was an error when the MSA was written.

Q. Okay. But that's—that's what this particular provision says, correct?

A. Correct. That couldn't be carried out because this is not a QDRO qualifying account.

[PETITIONER'S COUNSEL]: Your honor, objection. As to strike for being unresponsive.

THE COURT: Sustained. Please answer only the questions you're asked. Next question."

¶ 18    The trial court found that respondent knowingly and intentionally violated the terms of the judgment when she withdrew the entire balance of the joint E*TRADE account. Therefore, the court held her in indirect civil contempt. In its ruling, the court noted that respondent was correct that "a QDRO won't do that. You don't need a QDRO for that." Nevertheless, the court found that the judgment was clear that the joint E*TRADE account was to be divided equally between the parties. The court found that respondent's testimony was insufficient to establish that she acted out of necessity, because "she did have other available means with which to pay those expenses and seek reimbursement." The court rejected respondent's argument that "she had no other choice but to use the only joint asset to pay those other joint expenses." The court ordered respondent to pay petitioner $3670.45—half the value of the joint E*TRADE account—and sentenced her to jail until she complied. The court stayed the sentence until October 12, 2021.

¶ 19    The matter then proceeded to a hearing on respondent's petition for a rule to show cause. Respondent's counsel first addressed count I of respondent's petition, which is the only count at issue here. Counsel argued that, as of September 8, 2020, when respondent filed her petition, more than 120 days had passed since the dissolution judgment, yet the retirement accounts were still undivided. Respondent blamed this on petitioner's repeated refusal to divide the accounts. Counsel claimed that "[petitioner's] actions were willful contumacious and disregarded the judgment." Counsel further noted that respondent filed a motion to compel the entry of a QDRO for the Barclay 401(k) account and that the matter had proceeded to a hearing. She argued that, although the Barclay 401(k) account had since been divided, the Roth IRA had not. She asked "that a rule be issued against [petitioner] to show cause why he shouldn't be held in contempt for failing to follow the [MSA] and judgment as it relates to the Barclay[ ] 401(k) and the Roth IRA."

¶ 20    After that, the trial court inquired: "What specific provision do you allege that [petitioner] has not complied with of the judgment?" Respondent's counsel responded that, under the MSA, each party was entitled to one-half of the Roth IRA. Counsel agreed that a QDRO was unneeded for the Roth IRA. Nevertheless, she asserted that petitioner has "refused to sign the document" to transfer the money. The court asked: "So where does it say he was required to do anything? You're talking about contempt, not whether she's entitled to it. I don't see anything in here that he's required to do anything." Counsel directed the court to the following language in the MSA: "Each party shall contact his or her respective attorneys within 30 days after the entry and copy the other through his respective counsel. Both parties shall cooperate in the drafting and execution of any QDROs and that they shall be entered within 90 days." The court responded that a QDRO was not required for an IRA, and it asked how it could hold petitioner in contempt for not doing a QDRO when one was not required. Counsel argued that the court should hold petitioner in contempt for refusing to transfer the funds to respondent. The court stated:

> "Look, I don't think—if that's what the evidence is going to be, I don't think the *prima facia* case of noncompliance with the judgment is made because there is no specific provision in this judgment that he has violated about that IRA account. *** Count I is denied."

¶ 21    The trial court's written order, in addition to finding respondent in indirect civil contempt and refusing to find petitioner in indirect civil contempt, ordered respondent's counsel to submit a proposed order to divide the Roth IRA for "review and possible execution, per the Court's discretion." A separate order, filed that same day, ordered the parties to divide the Roth IRA account equally.

¶ 22 On September 10, 2021, respondent filed a motion for reconsideration. Respondent argued, among other things, that the erroneous references in sections 10.1 and 10.4 of the MSA to the use of QDROs to divide the Roth IRA and the E*TRADE account rendered those provisions "vague enough that the Court's duty was to construe the ambiguity against the drafter," *i.e.*, petitioner's counsel. Respondent further argued that other language "was clear in its requirement for the parties to cooperate to accomplish the division of assets within 90 days." Respondent asserted:

> "The Court used the reasoning about the 'QDRO' requirement to deny any finding of contempt against [petitioner], while making a finding of contempt against [respondent] when the provision regarding division of the E*Trade account had that same strict language which should have protected her against contempt just as the Court allowed it to protect [petitioner]."

Respondent asked the court to "reconsider its contempt finding against [her]" and to "reconsider [its] finding of noncontempt against [petitioner] to hold him in contempt and to allow for [respondent] to file a fees petition against him."

¶ 23 On September 13, 2021, petitioner filed a petition for $7992.50 in attorney fees and costs incurred for his petition for a rule to show cause against respondent.

¶ 24 On November 16, 2021, following a hearing, the trial court denied respondent's motion for reconsideration. The court found that the MSA's reference to using a QDRO to divide the joint E*TRADE account and the Roth IRA, when those accounts were not divisible by a QDRO, did not render the provisions ambiguous, "even if the phraseology utilized therein amounted to legal nullities." Concerning its denial of a finding of indirect civil contempt against petitioner, the court stated: "[T]he contempt would have required a specific court order creating a specific obligation; and it was for that reason that the Court found that a contempt finding could not be entered."

Concerning its finding of indirect civil contempt against respondent, the court stated: "Yeah, you're right, that the exact same language [as to a QDRO] is in there about the E*Trade account. But the basis for the contempt finding against [respondent] was not whether or not she divided or not or should have divided it, it was that she took the whole thing." The court stated further: "And so the language—although, equally as ineffective as the other language about dividing an E*Trade account by QDRO, was really immaterial to the issue before the Court about the violation of the order that the Court found she had made."

¶ 25    After hearing argument on petitioner's petition for attorney fees and costs, the court awarded petitioner $3900.

¶ 26    Respondent timely appealed.

¶ 27                              II. ANALYSIS

¶ 28    Respondent argues that the trial court erred in (1) finding her in indirect civil contempt for violating the MSA and (2) refusing to find petitioner in indirect civil contempt for violating the MSA.

¶ 29    Generally, a party commits indirect civil contempt when the party fails to comply with a court order outside of the court's presence. *In re Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494, ¶ 50. The terms of an MSA are enforceable through contempt proceedings. See 750 ILCS 5/502 (e) (West 2020).

> "A petition for a rule to show cause is the method for notifying the court that a court order may have been violated, and the petitioner requests a hearing on the issue. The petition for a rule to show cause and the rule to show cause operate together to inform the alleged contemnor of the allegations against her. The rule to show cause is the method by which the court brings the parties before it for a hearing. It also notifies the alleged

contemnor of the time and place of the hearing. Thus, the petition for a rule to show cause initiates the contempt proceedings, but it does not establish that a violation of a court order has in fact occurred. The rule to show cause, issued by the court, is not a finding [that] a violation of a court order has occurred, but part of the process of notifying the alleged contemnor of the charges, and time and place of the hearing. At the hearing, the burden is on the petitioner to show a violation of a court order has occurred. Once this showing has been made, the burden shifts to the alleged contemnor to show the violation was not willful." *In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993).

¶ 30    "Civil contempt is a coercive sanction rather than a punishment for past contumacious conduct." *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007). "[C]oercion is the goal of indirect civil contempt of court and punishment is the goal of criminal contempt of court." *In re Marriage of Berto*, 344 Ill. App. 3d 705, 713 (2003). Thus, a valid civil contempt order must contain a purge provision, which lifts the sanction when the contemnor complies with the order. *Felzak*, 226 Ill. 2d at 391. "A contemnor must be able to purge the civil contempt by doing that which the court has ordered him to do." *Id.* "[A] finding of civil contempt is not proper unless the ability to purge a contempt finding is within the power of the contemnor." *In re Marriage of O'Malley ex re. Godfrey*, 2016 IL App (1st) 151118, ¶ 29.

¶ 31    " 'Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.' " *Knoll*, 2016 IL App (1st) 152494, ¶ 50 (quoting *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17). A decision is against the manifest weight of the evidence if " 'the opposite conclusion is clearly evident' " or

the court's findings are " 'unreasonable, arbitrary, and not based on any of the evidence.' " *Id.* (quoting *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43).

¶ 32 We first address respondent's argument that the trial court erred in finding her in indirect civil contempt. According to respondent, because section 10.4 of the MSA required the joint E*TRADE account "to be divided by impossible means"—*i.e.*, a QDRO—it was "ambiguous" and "unenforceable through contempt power." We disagree. The provision governing the joint E*TRADE account unambiguously provided that "[e]ach Party is entitled to one half (50%) of said account." Although the provision also stated that the account "shall be split pursuant to the QDRO," the parties agree that the account is not divisible by a QDRO. Indeed, respondent unilaterally withdrawing all the money in the account shows that a QDRO was not necessary to access and divide the funds. Nevertheless, as the trial court found, respondent was held in contempt not for how she accessed the funds but for removing all the funds in the account. Moreover, respondent conceded at the outset of the hearing on petitioner's petition that she entirely depleted the joint E*TRADE account. This account depletion violated the MSA, which unambiguously provided each party with half of that account.

¶ 33 Once petitioner established that respondent violated the MSA, the burden shifted to respondent to prove that her failure to comply with the MSA was not willful. Respondent testified that she withdrew the money to pay certain joint expenses. However, the trial court found that respondent's testimony was insufficient to establish that she accessed the funds out of necessity. Instead, the court found that respondent knowingly and intentionally violated the terms of the judgment and held her in indirect civil contempt. Other than challenging the enforceability of section 10.4 itself, respondent makes no argument on appeal that the court's ruling that she knowingly and intentionally violated the MSA was against the manifest weight of the evidence or

otherwise an abuse of discretion. Therefore, she has forfeited any such argument. "Points not argued [in the appellant brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Accordingly, based on the foregoing, we cannot say the trial court erred in holding respondent in indirect civil contempt.

¶ 34    We next address the trial court's denial of respondent's petition for a finding of indirect civil contempt against petitioner. We note that, in her argument on appeal, respondent does not refer to the allegations in her petition concerning petitioner's alleged failure to cooperate with the division of the Roth IRA. Instead, she focuses solely on the trial court's ruling on the Barclay 401(k). Thus, we confine our analysis to the trial court's ruling regarding the Barclay 401(k).

¶ 35    Respondent frames the issue as follows: "The issue is whether the party's [*sic*] [MSA] placed an obligation on [petitioner] to assist or otherwise cooperate with the division of the Barclay[ ] 401(k)." According to respondent, "the court based its denial off the belief that the MSA did not specifically order [petitioner] to do something"—a belief she claims is "rebuffed" by the language of the MSA, which specifically required "cooperation."

¶ 36    First, we note that the trial court's comments to which respondent refers were made about the Roth IRA, *not* the Barclay 401(k). At the outset of her argument on count I of her petition, respondent's counsel reminded the court that, when she filed the petition, 120 days had passed since the dissolution judgment, yet petitioner had still refused to divide the Roth IRA and the Barclay 401(k). She conceded that the Barclay 401(k) had since been divided, but she noted that "the Roth IRA [was] still not divided." Counsel and the court then proceeded to address the Roth IRA, which was not divisible by QDRO. The court stated: "[Y]ou can't hold him in contempt for [not] doing a QDRO when there is no QDRO. You're not going to QDRO an IRA." The court

- 13 -

concluded: "I don't think the *prima facie* case of noncompliance with the judgment is made because there is no specific provision in this judgment that he has violated about that IRA account."

¶ 37 Regardless of whether petitioner failed to cooperate as required in preparing a QDRO for the Barclay 401(k), the QDRO for that account *was completed* before the hearing on the petition for a rule to show cause. Thus, there was no means left by which petitioner could purge himself of the alleged contempt and, accordingly, no basis to find him in indirect civil contempt. See *Berto*, 344 Ill. App. 3d at 712-13 (where the proceedings on the petition for rule to show cause for indirect civil contempt were initiated to compel the respondent to pay past-due monthly maintenance and child support payments ordered under the parties' MSA and the respondent paid the arrearage at the hearing on the petition, respondent could not be found in indirect civil contempt, as there was no means by which he could purge himself of contempt); *First Midwest Bank/Danville v. Hoagland*, 244 Ill. App. 3d 596, 611-12 (1993) (where the proceedings on the petition for rule to show cause for indirect civil contempt were initiated to compel the respondent to comply with a court order requiring him to turn over copies of his tax returns within five days of filing and the respondent turned them over before the hearing on the petition—although not within five days of filing—the respondent could not be found in indirect civil contempt, because there was no action of the respondent to coerce). Indeed, the fact that the parties resolved the Barclay-401(k) issue before the hearing is presumably why the trial court addressed only the Roth IRA. Accordingly, petitioner could not have been held in indirect civil contempt for the Barclay 401(k) issue, because doing so would not coerce petitioner to do anything; rather, it would punish him for his alleged failure to cooperate. Thus, we find no error.

¶ 38 We note that, in her opening brief, respondent also states:

"Furthermore, further litigation presumably incurred additional attorney fees, given that [respondent's] contempt pleading sought reimbursement of incurred fees. The Court's denial of [respondent's] motion without requiring [petitioner] to justify his explanation was in error. And the denial of contempt should be reversed and remanded for hearing on whether [petitioner's] objection was for purposes of delay, harassment, or otherwise in bad faith."

Aside from this single reference to attorney fees, respondent makes no argument in her initial brief that the trial court erred in denying her request for attorney fees related to obtaining the QDRO for the Barclay 401(k). Instead, she focuses entirely on the propriety of the court's refusal to find petitioner in contempt. Nor does she cite any authority. Therefore, she has forfeited any possible argument that she was entitled to attorney fees based on petitioner's objection to the QDRO. "Points not argued [in the appellant brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 31 (points unsupported by citation to pertinent authority are forfeited).

¶ 39    In her reply brief, respondent argues: "It was only after [respondent] filed her petition for indirect civil contempt[ ] that the orders resolving her share of the retirement accounts was [*sic*] resolved." She cites section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(b) (West 2020)). She argues that the Act "allows the court to allocate attorney fees should a party's violation [of a judgment] be without compelling cause or justification. And this was part of her prayer for relief." To be sure, "[a] finding of contempt is sufficient to require an award of fees under section 508(b), but such a finding is not necessary. [Citation.] The party that fails to comply with an order bears the burden of proving that compelling cause or justification

for the noncompliance exists." *Berto*, 344 Ill. App. 3d at 717. Thus, despite the trial court's refusal to find petitioner in indirect civil contempt, respondent could possibly have been entitled to attorney fees based on petitioner's objection to the QDRO and the division of the Roth IRA *if* the trial court had found that, by so objecting, petitioner failed to comply with the MSA and had no compelling cause or justification for that noncompliance. However, that does not seem to be respondent's argument. Nor does she cite any relevant authority other than the statute to support a claim to attorney fees. In any event, under the plain language of Rule 341(h)(7), quoted above, raising an issue for the first time in her reply brief does not avoid forfeiture.

¶ 40                                     III. CONCLUSION

¶ 41     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 42     Affirmed.