# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Banister v. Partridge*, 2013 IL App (4th) 120916

---

| | |
|---|---|
| Appellate Court Caption | LEAH GUFFEY BANISTER, Petitioner-Appellant and Cross-Appellee, v. RANDOLPH PARTRIDGE, Respondent-Appellee and Cross-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0916 |
| Filed | February 26, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from petitioner's request to remove the parties' child from Illinois to live in Maine with her husband, the trial court's finding that the move would not be in the child's best interest was against the manifest weight of the evidence, regardless of the fact that respondent's time with the child would be diminished, since petitioner had been cooperative in providing respondent access to the child and prohibiting the move would adversely affect the child's quality of life. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 03-F-152; the Hon. Esteban F. Sanchez, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part. |

Counsel on Appeal

Peggy J. Ryan (argued) and J. Scott Williams, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

Randy S. Paswater (argued), of Barber, Segatto, Hoffee, Wilke & Cate, of Springfield, for appellee.

Panel

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Appleton and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1 After petitioner, Leah Guffey Banister, and respondent, Randolph Partridge (hereinafter, Randy), ended their relationship, Leah gave birth to her son, D.G. (born September 7, 2002). On Leah's later petition under the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 to 28 (West 2010)), the trial court entered several orders, establishing Randy's paternity, his support obligation, and granting Leah custody of D.G. subject to Randy's visitation.

¶ 2 In July 2009, Leah married Thomas P. Banister, who lived in Kentucky as a senior enlisted soldier serving in the United States Army. Two years later, Leah filed a "petition for leave to remove minor child from state," requesting to move D.G. from Illinois to Kentucky to reside with her husband. Randy objected and filed separate pleadings to prevent the move and obtain primary custody of D.G. Randy also filed contempt charges against Leah for moving D.G. to Kentucky in violation of the trial court's order. In December 2011, the court granted Leah's petition, and in March 2012, the court dismissed Randy's contempt claim.

¶ 3 In April and July 2012, the parties filed the following pleadings: (1) Randy filed a motion to reconsider the trial court's approval of Leah's petition for leave to remove D.G. to Kentucky; (2) Leah filed a petition for leave to remove D.G. to Maine, explaining that Thomas had recently received military orders to the University of Maine to serve as a Reserve Officer Training Corps instructor; and (3) Randy filed a motion to reopen proofs, requesting that the court "allow testimony as to the changes in circumstances" with regard to Leah's petition for leave to remove D.G. to Maine and "any additional changes relating thereto" since the court's December 2011 order. Following a July 2012 hearing, the court dismissed Randy's pleadings on jurisdictional grounds and denied Leah's petition for leave to remove D.G. to Maine.

¶ 4 Leah appeals, arguing that (1) the trial court lacked the statutory authority to consider her petition for leave to remove D.G. to Maine and (2) the court's best-interest finding, denying her petition to remove, was against the manifest weight of the evidence. Randy cross-appeals, arguing that the court erred by (1) dismissing his emergency petition for rule to show cause,

seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky in violation of the court's oral admonishment and (2) finding that Illinois Supreme Court Rule 304(b)(6) (eff. Feb. 26, 2010) divested the court of jurisdiction to address his motions to reconsider and reopen proofs.

¶ 5    Because we disagree that it was in D.G.'s best interest to deny Leah's petition for leave to remove him to Maine, we reverse that portion of the trial court's judgment.

¶ 6                                    I. BACKGROUND

¶ 7             A. The Circumstances Preceding the Disputes at Issue and Leah's
                   Initial Petition for Leave To Remove D.G. to Kentucky

¶ 8    Prior to January 2002, Leah, who lived in Williamsville, Illinois, had a relationship with Randy. In September 2002, after that relationship had ended, Leah gave birth to D.G. In April 2003, Leah filed a petition to determine the existence of the father and child relationship under the Parentage Act. Genetic testing later confirmed Randy was D.G.'s biological father. In October 2003, the trial court entered an order of parentage and support, finding that Randy was D.G.'s biological father. In December 2003, the court granted Leah custody of D.G. subject to the parties' visitation agreement and ordered Randy to pay Leah child support of $194 biweekly.

¶ 9    In August 2006, Randy filed an amended motion to modify, requesting termination of his child-support obligation. Randy explained that in July 2005, he was involved in a motorcycle accident that caused him to remain in a comatose state for over a month and hospitalized for over three months. Randy subsequently lost his job as a heavy equipment mechanic and had lingering injuries, which included the inability to sit or stand for extended periods. In January 2006, the federal government classified Randy as disabled and began disbursing monthly social security disability benefits of $1,661 for himself and $831 for D.G. Following a September 2006 hearing, the trial court terminated Randy's child-support obligation.

¶ 10   In July 2009, Leah married Thomas, a native of Springfield, Illinois, and a senior enlisted soldier stationed at Fort Campbell, Kentucky. Because of Thomas' impending deployment to Afghanistan, Leah remained in Williamsville with D.G., and Thomas commuted from Fort Campbell to Williamsville to be with them on weekends. In June 2010, Thomas deployed to Afghanistan, and in April 2011, he returned to Fort Campbell.

¶ 11   In June 2011, Leah informed Randy that she was moving to Fort Campbell. Later that month, Randy filed a motion to enjoin, alleging that such a move was not in D.G.'s best interest because it would "substantially diminish" Randy's relationship with D.G. In response to Leah's July 2011 "petition for leave to remove minor child from state," Randy filed an emergency petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky in violation of the trial court's admonishment to Leah's attorney that Leah should "not take any action that would be construed as removing [D.G.] from the State on a permanent basis until such time as a hearing was held." At an August 2011 status hearing on Randy's emergency petition for rule to show cause, the parties

-3-

stipulated that Leah and D.G. had moved to Kentucky, where D.G. was enrolled in school. The court then continued the hearing.

¶ 12 In September 2011, Randy filed, in part, the following: (1) a petition for *in camera* interview of D.G. and (2) a petition to modify custody, seeking permanent custody of D.G. (The record shows that Randy also filed a second petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for failing to comply with the parties' child-visitation schedule, which the trial court later dismissed; that pleading is not at issue in this appeal.) In October 2011, the court conducted an *in camera* interview with D.G. Later that month, and continued into November 2011, the court conducted hearings on Leah's petition for leave to remove D.G. to Kentucky and Randy's aforementioned filings. After taking the matter under advisement, the court entered a written order on December 22, 2011.

¶ 13                              B. The Trial Court's December 22, 2011, Order

¶ 14                          1. *A Summation of the Trial Court's Recital of Facts*

¶ 15 The trial court observed that D.G., a nine-year old boy, was "friendly, respectful, intelligent, articulate, and caring." D.G., who was active in sports, was performing well in school but required extra assistance with reading comprehension. Leah has cared for D.G. since his birth and is a "very good and loving mother" who has provided D.G. a safe and healthy living environment. Leah has maintained a cooperative relationship with Randy and has encouraged D.G. to visit with him.

¶ 16 Despite Randy's objection, in June 2011, Leah and D.G. moved to Kentucky at Thomas' urging so that they could experience–for the first time–life together as a family. Thomas, who resides with his daughters (20 years old and 14 years old, respectively) from a previous marriage, lives in a spacious four-bedroom home in a new housing development at Fort Campbell. Although D.G. likes his new school, where he has made new friends and enjoys Fort Campbell, he misses his old school, friends, and cousin.

¶ 17 When Leah moved to Kentucky, she ended her City of Springfield employment in administration and agreed to become a homemaker. Leah volunteered at D.G.'s school and supported military families through various military organizations. Thomas stated his intention to retire in 2015 and return to Springfield, where his extended family lives. Leah and Thomas "reportedly have a strong and happy marriage and are adjusting to their new life together," which several witnesses corroborated.

¶ 18 Randy is single and lives in Cantrall, Illinois, in a spacious manufactured home that is appropriately furnished. His large parcel of land contains a swimming pool and an assortment of motorcycles, all-terrain vehicles, and other sporting equipment that Randy enjoys with D.G. The trial court noted that after his serious motorcycle accident, Randy had a second accident, and it "appears" that both accidents may have involved alcohol. Randy concedes he drinks alcohol but denies drinking to the point of intoxication. By all accounts, Randy is a "very good and devoted father," attentive to D.G.'s education, and involved in all aspects of D.G.'s life. D.G. loves Randy, and his relocation to Fort Campbell has been hard on both of them.

¶ 19                          2. *The Trial Court's Findings*

¶ 20        With regard to Leah's petition for leave to remove D.G. to Kentucky, the trial court, citing the supreme court's decision in *In re Marriage of Eckert*, 119 Ill. 2d 316, 326-27, 518 N.E.2d 1041, 1045-46 (1988), considered the following four factors, in addition to all relevant evidence presented, in determining whether Leah's proposed move to Kentucky was in D.G.'s best interest: (1) the likelihood that the move would enhance the general quality of life for both Leah and D.G.; (2) ensuring that Leah's motive in seeking to move was not merely a ruse to defeat or frustrate Randy's visitation; (3) Randy's motives in resisting the move; and (4) whether a realistic and reasonable visitation schedule could be established if the move occurred.

¶ 21        The trial court found that (1) the lives of Leah and D.G. would be enhanced because they would be together as a family and Leah would be able to spend more time with D.G., given her new duties as a stay-at-home mom; (2) Leah's motivation was not trivial, capricious, or an effort to disrupt D.G.'s relationship with Randy, but was, instead, based on her desire to live as a family with Thomas and his children for the first time since her marriage to Thomas; (3) Randy's opposition to the move was "well grounded and valid"; and (4) given the parties' cooperation in the past, the proposed visitation schedule Leah proffered would provide Randy "significant contact" with D.G., thereby fostering their relationship.

¶ 22        Thereafter, the trial court granted Leah's motion for leave to remove D.G. to Kentucky. In so doing, the court ordered the parties to "discuss and reach agreement, if possible, on the details of a visitation order consistent with the findings of the court on this issue."

¶ 23        The trial court also denied Randy's motion to enjoin and his motion to modify custody. With regard to Randy's emergency petition for rule to show cause, the court found that Leah had violated section 609 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609 (West 2010)) and ordered her to show cause why she should not be held in contempt. The court then continued the matter until March 2012.

¶ 24               C. The Trial Court's March 2012 Contempt Finding

¶ 25        Following a March 2012 hearing on Randy's emergency petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky in violation of the trial court's oral admonishment, the court entered the following order:

> "Court finds [Leah] is not in contempt of court: 1. She was advised by counsel 'not to take permanent steps regarding move to Kentucky' and did not interpret the statement as a prohibition for the move; 2. the record is silent as to a written order setting forth the Court's order. Court finds move was not willful violation. *** Cause stricken."

¶ 26        D. Randy's Separate Motions To Reconsider and Reopen Proofs
               and Leah's Petition for Leave To Remove D.G. to Maine

¶ 27        On April 17, 2012, Randy filed a motion to reconsider, arguing that the trial court's December 2011 order approving Leah's petition for leave to remove D.G. to Kentucky was

against the manifest weight of the evidence. The same day, Leah filed a "petition for leave to remove minor child," explaining that a week earlier Thomas had received military orders to the University of Maine to serve as a Reserve Officer Training Corps instructor. In July 2012, Randy filed a motion to reopen proofs, requesting that the court "allow testimony as to the changes in circumstances" with regard to Leah's petition for leave to remove D.G. to Maine and "any additional changes relating thereto" since the court's December 2011 order. In this regard, Randy petitioned the court to apply any "changes in circumstances" to the court's reconsideration of his June 2011 motion to enjoin and his subsequent motions to modify custody.

¶ 28        E. The Trial Court's Consideration of the Parties' Remaining Issues

¶ 29    At a July 2012 hearing, the parties presented argument concerning the trial court's jurisdiction to address Randy's motions to (1) reconsider the court's December 2011 order approving Leah's petition for leave to remove D.G. to Kentucky and (2) reopen proofs on Leah's petition for leave to remove D.G. to Kentucky. After a short recess, the court found that Rule 304(b)(6), which pertains to orders that are appealable without a special finding, divested the court of jurisdiction to consider the merits of Randy's motions to reconsider and open proofs because the court had entered those orders more than 30 days earlier. Thereafter, the court heard evidence regarding whether Leah's proposed move to Orono, Maine, where the University of Maine is located, was in D.G.'s best interest. Following the presentation of evidence and argument, the court took the matter under advisement.

¶ 30    In August 2012, the trial court entered a written order, reiterating the aforementioned jurisdictional and contempt findings the court made during the July 2012 hearing. In addressing Leah's petition for leave to remove D.G. to Maine, the court again employed the four *Eckert* factors, noting that "many of the facts and considerations discussed in this court's order of December 21, 2011[,] remain true today." In this regard, the court determined that the first three *Eckert* factors pertaining to the enhancement of the lives of Leah and D.G. and the motivations of the respective parties in seeking or opposing D.G.'s move to Maine, were unchanged. With regard to the fourth factor–that is, whether a realistic and reasonable visitation schedule could be established if the move occurred, the court noted that the distance from Springfield, Illinois, to Fort Campbell, Kentucky, was 320 miles, whereas the distance from Springfield to Orono, Maine, was 1,420 miles. The court then stated, in pertinent part, the following:

    "The proposed move[ ] to Orono would significantly and negatively impact Randy's and [D.G.'s] strong relationship and bond. Although it is possible that they could maintain some sort of relationship, the distance would make it almost impossible for Randy and [D.G.] to see each other frequently and participate in each other's activities. Randy and [D.G.] have a special relationship which has involved almost daily contact with each other at school, athletic[,] and scouting activities, not to mention all of the activities they engaged in when D.G. visited Randy's home (riding motorbikes, bicycling, swimming, camping, and hiking among others.) Although the move to Kentucky impacted that relationship, the opportunity for frequent and significant contact was only

a few hours' drive away. The move to Orono will not afford either [D.G.] or Randy those opportunities.

    *** There is no doubt that [D.G.'s] move to Maine will provide him with new opportunities to see a new and different part of the country, enjoy living at home ***, make new friends, and advance his education. The price he will pay, however, is the erosion of the strong bond and relationship he had with [Randy]. ***

    Based on the above, this Court believes that if [D.G.] is allowed to move to Maine, there is no realistic and reasonable visitation schedule which can be created which would preserve and foster [D.G.'s] relationship with Randy. For the reasons stated above, Leah's petition for Removal is denied."

¶ 31 Shortly thereafter, Leah filed a motion to vacate the trial court's August 2012 order, arguing that the court lacked the authority to deny her subsequent petition for leave to remove D.G. to Maine. After Randy and Leah submitted written briefs in support of their respective positions, the court entered an order denying Leah's motion to vacate.

¶ 32 This appeal followed.

¶ 33 II. ANALYSIS

¶ 34 Leah argues that (1) the trial court lacked the statutory authority to consider her petition for leave to remove D.G. to Maine and (2) the court's best-interest finding, denying her petition to remove, was against the manifest weight of the evidence. Randy cross-appeals, arguing that the court erred by (1) dismissing his emergency petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky in violation of the court's oral admonishment and (2) finding that Rule 304(b)(6) divested the court of jurisdiction to address his motions to reconsider and reopen proofs. We address the parties' contentions in turn.

¶ 35 A. Leah's Statutory Claim

¶ 36 Leah argues that the trial court lacked the statutory authority to consider her petition for leave to remove D.G. to Maine. We disagree.

¶ 37 Section 609(a) of the Marriage Act provides that a "court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children." 750 ILCS 5/609(a) (West 2010). Although Leah and Randy were never married, the Marriage Act applies to their situation through section 14(a)(1) of the Parentage Act, which states that "[i]n determining custody, joint custody, removal, or visitation, the court shall apply the relevant standards of the *** Marriage Act, including [s]ection 609." 750 ILCS 45/14(a)(1) (West 2010).

¶ 38 In *In re Marriage of Lange*, 307 Ill. App. 3d 303, 309, 717 N.E.2d 507, 512 (1999), this court rejected the argument that Illinois trial courts did not have the authority to consider a subsequent petition for leave to remove a child from a state other than Illinois. We explained that decision, as follows:

"In the case at bar, to determine that the trial court did not have the authority to rule upon the request to move the children from Indiana to Texas would deprive the trial court of the authority to enforce the visitation provisions of the judgment of dissolution in spite of the clear legislative intention to the contrary expressed in the Illinois Act and the Marriage Act. Here, the circuit court in Illinois entered the judgment of dissolution and retained jurisdiction to enforce that judgment. It has the authority, incident to its power to enforce and modify the custody and visitation provisions of the judgment of dissolution, to grant or deny a motion by a custodial parent residing with the children outside of Illinois to remove the children from the current custodial residence to a more remote residence in some third state." *Lange*, 307 Ill. App. 3d at 311, 717 N.E.2d at 513.

Leah acknowledges our decision in *Lange* but relies on the Fifth District's decision in *In re Parentage of Tavares*, 363 Ill. App. 3d 964, 969, 845 N.E.2d 735, 739 (2006), for the proposition that once leave is given to a parent to move a child from Illinois, neither the Marriage Act nor Parentage Act requires a parent to seek further leave of court to move a child to another state.

¶ 39     In *Tavares*, 363 Ill. App. 3d at 965-66, 845 N.E.2d at 736-37, the respondent, an airman in the United States Air Force stationed in Illinois, had joint custody of her son with the petitioner, also an airman stationed in Illinois who enjoyed liberal visitation. Later, when the respondent received military orders transferring her to Alaska, the parties mutually agreed to modify the visitation schedule of their joint parenting agreement, which the trial court later approved. *Tavares*, 363 Ill. App. 3d at 966, 845 N.E.2d at 737. Approximately 16 months after the respondent moved to Alaska, the petitioner filed a petition to modify custody. *Id.* The respondent cross-appealed, filing a motion to modify visitation. *Tavares*, 363 Ill. App. 3d at 966-67, 845 N.E.2d at 737.

¶ 40     At a later hearing on the parties' respective filings, the petitioner testified that he believed the respondent was planning on leaving the military and moving to Texas. *Tavares*, 363 Ill. App. 3d at 967, 845 N.E.2d at 737-38. Upon hearing this testimony, the trial court directed the respondent to file a petition to remove, which the court later denied. *Tavares*, 363 Ill. App. 3d at 967-68, 845 N.E.2d at 738. On appeal, the Fifth District concluded that the trial court erred because it was not authorized to direct the respondent to file a petition for leave to remove and to subsequently consider and deny that removal petition. *Tavares*, 363 Ill. App. 3d at 969, 845 N.E.2d at 739. In so concluding, the Fifth District stated that "[n]othing in the Parentage Act or the custody provisions of the *** Marriage Act *** requires a parent who has previously removed a child from the State of Illinois, with the permission of the court, to seek leave to move that child to another state." *Tavares*, 363 Ill. App. 3d at 969, 845 N.E.2d at 739.

¶ 41     In this case, Leah contends that the Fifth District's decision in *Tavares*, which she points out was decided approximately 6 1/2 years later than *Lange*, created a conflict between the districts on the issue of subsequent removals. Thus, Leah implicitly urges this court to reassess our position in *Lange* in light of *Tavares*. We decline to do so.

¶ 42     We first note that this court is not bound by decisions of other districts of the appellate court. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892

-8-

N.E.2d 994, 1006-07 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels."). In addition, we disagree with Leah's characterization that a conflict exists between the Fourth and Fifth Districts regarding subsequent removal petitions. Indeed, the Fifth District addressed this exact issue in *Tavares* as follows:

"Our decision in the instant case is consistent with the appellate court's decision in *In re Marriage of Lange* ***. *** In *In re Marriage of Lange*, the appellate court acknowledged that the trial court did not have the authority to consider a [subsequent] petition for leave to remove filed under section 609 of the Marriage Act but that it did have the authority to consider the move through its inherent authority to enforce the custody and visitation provisions of the judgment of dissolution." *Tavares*, 363 Ill. App. 3d at 970, 845 N.E.2d at 740.

¶ 43      Here, despite Leah's urging, we adhere to our conclusion in *Lange* and reaffirm our stance that a trial court's authority to address a subsequent petition for leave to remove a minor is an inherent part of the court's authority to enforce the custody and visitation provisions of the judgment of dissolution. *Lange*, 307 Ill. App. 3d at 310, 717 N.E.2d at 512. In so concluding, we note that our adherence and reaffirmation is akin to and consistent with other statutory provisions that authorize trial courts to monitor minors in specific circumstances to ensure that the conduct of a parent or guardian is in the minor's "best interests." See 705 ILCS 405/2-22(1) (West 2010) ("At the dispositional hearing, the court shall determine whether it is in the best interests of the minor *** that he be made a ward of the court, and, if he is *** the court shall determine the proper disposition best serving the health, safety and interests of the minor ***."); see also 705 ILCS 405/2-29 (West 2010) (explaining the trial court's authority to conduct parental fitness hearings and, if warranted, to later terminate parental rights under the Adoption Act (750 ILCS 50/1 to 24 (West 2010)) when such a determination is in the minor's best interests). Accordingly, we reject Leah's statutory challenge.

¶ 44                    B. The Trial Court's Best-Interest Finding

¶ 45      Leah also argues that the trial court's best-interest finding, denying her petition to remove, was against the manifest weight of the evidence. We agree.

¶ 46      "The paramount question presented by removal cases is whether the move is in the best interests of the children." *In re Marriage of Kincaid*, 2012 IL App (3d) 110511, ¶ 39, 972 N.E.2d 1218 (citing *Eckert*, 119 Ill. 2d at 325, 518 N.E.2d at 1044). In assessing best interests, a trial court should consider the following two salient points: (1) a child has an important interest in maintaining significant contact with both parents and (2) the quality of a child's life may be enhanced as a result of the custodial parent's life enhancement. *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 42, 964 N.E.2d 756.

¶ 47      "The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2010). A ruling on a petition for leave to remove a minor should not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Guthrie*, 392 Ill. App. 3d 169, 174, 915 N.E.2d 43, 47

-9-

(2009). A trial court's determination is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *Demaret*, 2012 IL App (1st) 111916, ¶ 43, 964 N.E.2d 756.

¶ 48    We first note that the trial court correctly identified that "many of the facts and considerations" documented in the court's December 2011 order allowing Leah to move D.G. to Kentucky remained unchanged when it considered Leah's subsequent petition to remove D.G. to Maine. Yet, despite this acknowledgment, the court found that the greater geographical distance between Illinois and Maine, as opposed to the distance between Illinois and Kentucky, warranted denial of Leah's petition. Cognizant of the standard of review and the deference this court affords the trial court's determination, we disagree that this extra distance warrants denial of Leah's removal petition, given Leah's testimony concerning her options if her petition were to be denied, as well as the resulting impact on D.G.'s quality of life.

¶ 49    At the July 2012 hearing on Leah's petition to remove D.G. to Maine, Leah testified that D.G. had spent approximately 30 days in Maine, in which she observed D.G.'s demeanor as "happy, excited, ready for the next adventure." She described the home Robert had rented in Maine as a 2,400-square-foot residence located directly across the river from Bangor, the third largest city in Maine with a population of approximately 50,000. The rented home has four bedrooms, one of which was D.G.'s that they had painted with colors D.G. selected and decorated with his favorite cartoon characters. Leah also described the school D.G. would attend as a fifth grader, acknowledging that the four weeks of summer vacation the school district allowed would be spent with Randy in Illinois. Leah was also willing to alternate the Thanksgiving holiday and a one week spring break with Randy, agreeing to allow D.G. to remain with Randy from Christmas day until the new year, and adding that she would assume the financial costs of the travel involved. Leah planned on being a homemaker and supporting D.G. as well as her stepdaughter in their academic and sporting endeavors.

¶ 50    Leah noted that if the trial court denied her petition, she would be forced to move back to Illinois because the Army would not allow her to continue to reside at Fort Campbell. Leah surmised that she would have to find work because Thomas' income could not support two separate households. As a result, Leah would have to rely on others to assist her not only with D.G., but also her minor stepdaughter, who would remain in her care. Leah also noted that a move back to Illinois would restrict the flexibility that her life now provides with regard to her interaction with D.G. Leah stated that she believed it would be in D.G.'s best interest to move to Maine because it would keep "the family that he has known together."

¶ 51    Here, although D.G.'s overall time with Randy will be diminished by moving to Maine, Leah's demeanor, which we note has remained consistent throughout D.G.'s life, is to cooperate with Randy with regard to his accessability to D.G. Although a denial of Leah's petition to remove would undoubtedly permit Randy more time with D.G., it will also come at the expense of the quality of life D.G. will forego if his family is separated and Leah has to obtain employment. Accordingly, we reverse the trial court's judgment.

¶ 52                                  C. Randy's Contempt Claim

¶ 53        In his cross-appeal, Randy argues that the trial court erred by dismissing his emergency petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky in violation of the court's oral admonishment. We disagree.

¶ 54        A trial court's contempt finding is reviewed under an abuse of discretion standard. *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 62, 890 N.E.2d 1256, 1276 (2008).

¶ 55        We first note that in his August 2011 emergency petition for rule to show cause, seeking cause as to why Leah should not be held in contempt for moving D.G. to Kentucky, Randy fails to specifically classify the type of contempt charge he is levying against Leah. See *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43, 558 N.E.2d 404, 415 (1990) ("Because the procedures which must be followed in contempt cases vary according to the type of contempt involved, proper classification of contempt charges is not a mere academic exercise.").

¶ 56        In this case, Randy contends that notwithstanding the trial court's oral admonition at the July 2011 status hearing that Leah should "not take any action that would be construed as removing [D.G.] from the State on a permanent basis until such time as a hearing was held," Leah "knowingly violated the court's [o]rder when she enrolled D.G. in a Kentucky school." Thus, because the record shows that Leah admitted enrolling D.G. in a Kentucky school–an action she took outside of the presence of the court–and Randy's petition sought to have Leah return D.G. to Illinois, Randy is, in effect, alleging that Leah is in indirect civil contempt of the court's oral admonition. See *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 15, 975 N.E.2d 1179 ("If contempt sanctions are imposed for a coercive purpose, to compel the contemnor to perform a particular act, the contempt is civil in nature."); see also *Betts*, 200 Ill. App. 3d at 48, 558 N.E.2d at 418-19 ("In indirect contempt cases, the judge does not have full personal knowledge of all elements of the contempt.").

¶ 57        Civil contempt proceedings have the following two fundamental characteristics: (1) the contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order. *Pancotto v. Mayes*, 304 Ill. App. 3d 108, 111, 709 N.E.2d 287, 289 (1999). In other words, the contemnor must have the opportunity to purge herself of contempt by complying with the applicable court order. *Betts*, 200 Ill. App. 3d at 43, 558 N.E.2d at 416.

¶ 58        In this case, the evidence showed that Leah, realizing that the trial court could deny her July 2011 petition for leave to move D.G. to Kentucky, made arrangements with the Williamsville school district to permit D.G. to return to school in Illinois if the court so decided. Randy contends that D.G.'s enrollment in a Kentucky school constitutes an "irrevocable and permanent step to change [D.G.'s] principal and permanent home," which violated the court's oral prohibition on *permanently* moving D.G. from Illinois. However, the court considered both arguments at the March 2012 hearing on Randy's emergency petition for rule to show cause and found that despite D.G.'s physical relocation to Kentucky, Leah's conduct in this regard did not constitute permanency. Given the evidence presented and our standard of review, we conclude that the court did not abuse its discretion by finding that Leah's conduct was not contemptuous. Accordingly, we affirm the court's denial of Randy's emergency petition for rule to show cause.

¶ 59                    D. The Trial Court's Jurisdictional Findings

¶ 60       Randy also argues that the trial court erred by finding that Rule 304(b)(6) divested the court of jurisdiction to address his motions to reconsider and reopen proofs. We decline to address Randy's arguments, because they are moot.

¶ 61       Here, Randy's separate motions to reconsider the trial court's approval of Leah's petition for leave to remove D.G. to Kentucky and reopen proofs concern the court's December 2011 order, approving Leah's petition for leave to remove D.G. to Kentucky. However, even if this court were to agree with Randy's argument in this regard, such a determination would not alter our overarching conclusion that the court's denial of Leah's subsequent petition to remove D.G. to Maine was contrary to the manifest weight of the evidence. Thus, we decline to address Randy's arguments. See *In re Karen E.*, 407 Ill. App. 3d 800, 804, 952 N.E.2d 45, 50-51 (2011) ("Generally, Illinois courts do not decide moot issues, render advisory opinions or consider issues where the outcome will not be affected by how the issues are decided.") (citing *In re Alfred H.H.*, 233 Ill. 2d 345, 351, 910 N.E.2d 74, 78 (2009)).


¶ 62                                III. CONCLUSION

¶ 63       For the reasons stated, we affirm in part and reverse in part.


¶ 64       Affirmed in part; reversed in part.