NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250061-U

NO. 4-25-0061

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re MARRIAGE OF TAYLOR C., | ) ) | Appeal from the Circuit Court of |
| Petitioner-Appellant, | ) | Fulton County |
| v. | ) | No. 21D9 |
| JOEL V., | ) ) | |
| Respondent-Appellee. | ) ) ) ) | Honorable Bruce C. Beal, Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's denial of appellant's petition to relocate the parties' children from Illinois to South Carolina.

¶ 2    On January 6, 2025, the trial court entered an order denying the petition of Taylor C. to relocate the children of her and respondent, Joel V., from Macomb, Illinois, to Greenville, South Carolina. Taylor appeals, arguing the court's findings regarding certain statutory factors found in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(g) (West 2022)) concerning relocation and the court's ultimate determination relocation was not in the children's best interests were against the manifest weight of the evidence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4    Taylor and Joel married in 2013 and divorced in 2021. During the marriage, L.V. was born in November 2016, and B.V. was born in February 2019. A parenting plan was entered on March 9, 2021. At that time, both parties resided in Canton, Illinois. Taylor and the children

moved to Macomb in April 2021. Joel moved in with his parents in Pekin, Illinois. After Taylor and Joel had moved to Macomb and Pekin, respectively, they had mutually agreed Joel would have parenting time with the children every week from Friday at 5:00 p.m. until Sunday at 11:00 a.m. Taylor had the children the remainder of the time.

¶ 5 On March 19, 2024, Taylor filed a petition to relocate L.V. and B.V. to Greenville, South Carolina. Taylor alleged she provided Joel with notice of her intent to relocate on January 25, 2024. Joel objected to the relocation on March 5, 2024. According to the petition, Taylor intended to relocate to provide the children better educational opportunities and for the employment purposes of her and Chad, her husband as of January 2023. She asked the trial court to allow the petition and modify the current parenting schedule, giving Joel parenting time with the children for a majority of all school breaks and Taylor the remainder of all other parenting time.

¶ 6 According to the petition, the children were in school during a large part of Taylor's parenting times, depriving her of weekend time with them under the current parenting schedule. In addition, under the current schedule, the children were unable to participate in extracurricular activities in Macomb. She also alleged Joel had ignored her concerns regarding the children's hygiene and lack of sleep while in his care. Taylor indicated her parents intended to move to South Carolina to continue their "steady presence" in the children's upbringing. Taylor also noted she had remarried in January 2023. She and her current husband, Chad C., had lived together since May 2021. Chad C. was a principal at a school in western Illinois. On September 23, 2024, the trial court held a hearing on the relocation petition. Taylor testified she had lived in Macomb since April 2021 and was married to Chad. She filed the petition to relocate because the Greenville area offered educational, recreational, and emotional opportunities for the children. Taylor noted

Greenville had an extensive park district, 11 libraries, a nationally ranked school system, was located in the Blue Ridge Mountains, and was only three hours from the beach.

¶ 7        Taylor did not believe the current parenting schedule was in the children's best interests because they were now older (seven and five years old) and wanted to become more involved in activities. Taylor asserted Joel had the quality weekend parenting time. When she did have weekend time with the children, they had gone to St. Louis, Chicago, Kansas City, and Indianapolis. Taylor testified she and the children spent time reading together and the children loved going to the library, where they participated in different programs. At the time of the hearing, Taylor was homeschooling the children. According to Taylor, although both children had a good experience in preschool, L.V.'s experience in kindergarten and first grade was not good. His classmates did not treat him well, and he was bored. Taylor said both children were enjoying the education and educational activities she provided at home.

¶ 8        Taylor said she and Joel had discussed homeschooling the children while they were married, and Joel was supportive of her homeschooling the children during the COVID-19 pandemic. However, Joel was no longer supportive of her decision to homeschool the children. If the trial court allowed Taylor to relocate the children to Greenville, she planned to enroll them in the public school system, which she described as amazing. However, if the court determined it was in the children's best interests to continue their homeschooling, she would do so. Taylor said Greenville had homeschooling co-ops and many social opportunities for children, which she had not found in Illinois. Further, Taylor said the parks in Macomb were not family friendly because of the behavior of multiple men.

¶ 9        Taylor testified South Carolina allowed parents to send their children to any public school in the state as long as the parent provided the children's transportation. She planned to send

L.V. and B.V. to either Paris Elementary School or the A.J. Whittenberg School of Engineering, which were both better than the schools in Macomb. Taylor said no school within a 50-mile radius of Macomb offered the programs provided by these two schools in Greenville.

¶ 10       In addition, Taylor indicated she was the children's primary caretaker. She asserted Joel had only taken the children to two doctor's appointments and had only attended one school event, which was B.V.'s preschool graduation in May 2024. She also claimed Joel had not asked how the children were doing in school until recently.

¶ 11       If allowed to relocate to Greenville, Taylor said she, Chad, and the children would reside in an apartment they leased in a safe part of the city, eight minutes from where her parents had purchased a home. She and Chad intended to purchase a home in the Greenville area the following summer. Even if her request to relocate was denied, Chad would move and reside in the apartment because he was working in Greenville and was the family's sole source of income.

¶ 12       Taylor said the drive from her home to Joel's home was 90 minutes. She believed moving the children to South Carolina would improve Joel and the children's relationship because Joel would have extended parenting time with them. In addition, Taylor said she would set up frequent on-line meetings for Joel and the children and hoped Joel would do the same for her when he had the children.

¶ 13       If the trial court approved the move, Taylor proposed Joel would have the children for extended visits of six weeks in the summer, a week in October around Columbus Day, two weeks around Christmas, and during spring break. She also suggested weekend visits near Louisville, Kentucky, twice per year. Taylor stated she would provide and pay for the children's transportation to Illinois for these visits. Taylor said Joel also could have extra visitation time in Greenville.

¶ 14 Taylor also said she did not think Joel was a stable father, had been manipulating the children, and tried to get Chad fired. However, Taylor acknowledged telling Joel many times that he was a good father and wanted him involved with the children. Taylor also agreed L.V. was doing well academically. However, she claimed L.V. did not like school and was frequently in tears when she picked him up.

¶ 15 Taylor testified the change in Joel's parenting time, if the move was approved, would not be necessarily better or worse for Joel and the children. She said the longer visits would allow Joel to take on more parenting tasks and have a more advanced parenting plan. She also indicated the new parenting plan would give her more time with the children during weekends, when she and the children had more discretionary time. However, she acknowledged she would be giving up a lot of time with the children in the summer. According to Taylor, her request to relocate to Greenville was not about employment.

¶ 16 For the most part, Taylor acknowledged the children currently were happy. However, when L.V. was in first grade, Taylor told Joel that L.V. was very unhappy at school. When Taylor tried to talk to Joel about L.V.'s education, Joel would not engage in a conversation. She acknowledged she had not moved to modify the joint parenting agreement before unilaterally deciding to homeschool the children against Joel's wishes.

¶ 17 Taylor agreed the children and Joel have a strong relationship. She also agreed remote communication is not the same as in-person contact. Further, she conceded Joel had a lot of family in central Illinois.

¶ 18 When questioned by the trial court, Taylor said she had looked at the Dunlap School District for the children but said it was very expensive to live in that district. She also had considered Peoria, where she spent a lot of time growing up. However, Taylor said Peoria did not

offer the educational, recreational, and other opportunities Greenville does.

¶ 19    Kelbie Jones testified she was a preschool teacher in Macomb and was familiar with B.V., who was in her class from August 2022 to May 2024. During that time, Jones became familiar with Taylor, who she described as an "A+" parent. Taylor was involved in all parent-teacher conferences, was a mystery reader in class multiple times, volunteered at parties, brought in snacks and drinks, and was involved in all extracurricular activities at the preschool. Jones said she met Joel briefly at a graduation ceremony for B.V. in May 2024 but had no other contact with him. She noted Joel had contacted the daycare where she was assigned in March or April of 2024 for progress reports on B.V.

¶ 20    Chad testified he currently lived in Greenville in a short-term rental and was employed as an assistant principal at a middle school there. He and Taylor were married on January 1, 2023. Prior to working in Greenville, Chad testified he was the principal at a pre-kindergarten thru eighth grade school in western Illinois. He had known L.V. and B.V. for over four years and had an amazing relationship with them. He frequently communicated with the children via telephone or FaceTime while the children were with Taylor. Joel did not allow Chad to communicate with the children during Joel's parenting time. Chad financially supported Taylor and the children. L.V. and B.V. had visited him in Greenville several times. He and Taylor had taken the children to three state parks, the Roper Mountain Science Center, the children's museum, the Blue Ridge Mountains, a local fun park, and the South Carolina coast and beach.

¶ 21    Before moving to Greenville, Chad testified he saw the children daily when Taylor had them. They had a nightly routine where they ate dinner together, went on walks, and read books. He and Taylor took turns talking to the children about their homework and singing to them before they went to bed. Chad still participated in some of these activities through FaceTime when

he was in Greenville. He indicated he had communicated with the children every day he could. If the relocation petition was denied, Chad indicated he would continue to reside in Greenville for some time. Chad described Taylor as an amazing mother who did many things for the children. He was not aware of Joel's claim Taylor did not allow Joel to communicate with the children every day via FaceTime.

¶ 22     Chad testified he and Taylor had an affair in 2016, and L.V. is his biological son. In 2016, Chad gave up his rights to L.V., and Joel adopted the boy. Chad stated he had a 16-year-old daughter in Illinois by his former wife. His daughter was allowed to choose to see Chad on weekends. She had not chosen to see him for over a year. As to his employment history, Chad testified he had worked at nine schools over the prior 10 years. His license to work as an administrator in Illinois was valid through 2026 and could be renewed if he completed the required professional development.

¶ 23     Tracy S., Taylor's mother, testified she and her husband, Scott S., who is Taylor's father, have two homes—a one-bedroom cabin in Canton, Illinois, and a three-bedroom home in Travelers Rest, South Carolina, about 10 minutes from Greenville. Regardless of whether Taylor's petition to relocate was granted or denied, Tracy and Scott planned to stay in South Carolina. Before moving from Illinois, she and Scott saw the children approximately once per week. If the children were in South Carolina, she expected they would see the children more. Tracy testified she had helped with the children's homeschooling and described Taylor as the best mother she knows. As for Chad, she had known him for around four years and was immediately impressed with him when they met. After Taylor and Joel's divorce, Tracy and her husband tried to maintain a good relationship with Joel while also getting to know Chad. Tracy indicated Chad adores the two children. Tracy said Joel had not been allowed in her house for over a year to pick up the

children because the children reacted poorly when he did.

¶ 24 Scott S. testified he knew Joel loved the children, but he thought Joel was "clingy" with B.V. and too attached to the children. Scott asserted Chad was a superb father and treated L.V. and B.V. like they were his own children.

¶ 25 Joel testified that he had lived in Pekin, Illinois, with his mother, father, and brother since late 2020. He had worked as an accountant at Spoon River Mechanical Services in Canton since 2013 and earned $25.50 per hour. The year before the hearing, Joel's gross income was $64,566. He believed he would make the same amount that year. Joel said he was current on his child support obligation and had never missed a payment. He and Taylor shared childcare, educational, and extracurricular expenses for the children. Joel testified the parenting agreement allowed Taylor to have one weekend with the children every eight weeks, but Taylor did not consistently take advantage of this until recently. Joel noted he and Taylor had joint decision making with the children. Prior to the summer of 2024, they had no issues with this. However, they recently had an issue regarding Taylor's wish to homeschool the children and his wish they attend the Lincoln School in Macomb.

¶ 26 Joel testified the children went through an adjustment period and were sad after the divorce in 2021. By the fall of 2021, the children were adjusting to the parenting schedule, their behavior improved, and exchanges went more smoothly. Joel stated it was hard for him to attend church regularly with the children because he returns the children to Taylor on Sundays at 11 a.m., but he provided the children a basis of religious faith. Joel testified he had FaceTimed with the children on a few occasions when they were with Taylor and told the children they could FaceTime him at any time. However, about a year before the hearing, Taylor said it was unhealthy for the children to be able to contact him at any time.

¶ 27        According to Joel, he always exercised his parenting time, could not remember a time he declined time with the children, and had never had to cut his time short with L.V. and B.V. When he had the children, he let them see other members of his family. He also allowed the children to visit Taylor's parents during his parenting time because they did not often get to see their grandchildren. According to Joel, he wanted to ensure the maternal grandparents were involved with the children. Joel denied the children ever had a meltdown when he picked them up or dropped them off at the maternal grandparents' home. After Taylor expressed her desire to relocate, Joel's contact with her parents basically ended.

¶ 28        Joel testified he and Taylor had agreed to send L.V. to the Lincoln School in Macomb. L.V. always told Joel that he loved going to school, making friends, and spending time with his peers. Joel indicated there was not an issue with L.V. attending the Lincoln School until Taylor wanted to relocate the children. Although he and Taylor have joint decision making for the children's education, Taylor unilaterally decided to homeschool the children for the 2024-25 school year because she claimed it was in the children's best interests. Joel objected to Taylor homeschooling the children every time she raised the issue. However, Joel acknowledged he had agreed to Taylor homeschooling the children in preschool.

¶ 29        As for the relocation petition, Joel testified he and Taylor had a conversation about the relocation petition before it was filed, but Taylor did not ask his opinion on the matter. Instead, she said the relocation was going to happen. According to Joel, Taylor said she would try to increase his child support obligation if he did not agree to the relocation. She also accused Joel of trying to hold the children back because of his "small-town mind and [his] fear of change." Joel denied this but asserted he liked stability.

¶ 30        Joel testified central Illinois has many fun, educational, and other activities for

children. He believed moving the children to Greenville would be detrimental to their mental and physical health. According to Joel, he currently had a close and loving relationship with the children but feared he would become a stranger if they moved to South Carolina. As for Taylor's proposal he would have longer periods of visitation if the children moved, Joel stated he preferred the current schedule because he worked Monday through Friday from 8 a.m. to 5 p.m. If he had the children for six weeks straight, he would still have to work, would have to find a sitter for the children, and would lose quality time with them. Even though he disagreed with Taylor's petition, he said she was a good mother and did what she thought was best for the children.

¶ 31 Brenda V., Joel's mother, testified she had known Taylor for approximately 20 years, loved her, and had a good relationship with her. After L.V. was born, Brenda babysat him every Friday. After the divorce, she basically had no communication with Taylor, who she described as "very vindictive." Brenda worked as a substitute teacher for the Pekin School District. She had two other sons besides Joel. The oldest was married with two children and lived 15 minutes from her. Her other son lived at her house along with Joel. She asserted they have a close, tight-knit family. She saw her oldest son's family approximately five times per week. According to Brenda, L.V. and B.V. were very close with Brenda's other two grandchildren.

¶ 32 On weekends, Brenda would talk to the children and give them hugs and kisses when they got to the house but then tried to give Joel time alone with them. Brenda would help Joel with the children when necessary, including going on outings. As a family, they read books, went fishing, did things in Peoria, and went to community events and parades. They also would sometimes have a pizza and movie night. When the children arrived at her house each week, they were somewhat reserved for a few hours before they relaxed and acted normally. Currently, when it was time to go back to Taylor, B.V. did not want to leave. Brenda said L.V. had similar issues

when he was B.V.'s age. According to Brenda, Joel had a very good relationship with both children, and she did not believe the children would adjust well to long periods of time away from him.

¶ 33    Jeri V., Joel's sister in law, testified she had known Joel and Taylor since around 2004. She normally saw Joel and the children every weekend. Her relationship with Taylor ended after the divorce. Jeri was a middle school and high school art teacher and was not aware of any major complaints about the schools in Macomb. She testified her children, who were three and eight years old, and Talyor and Joel's children were very close. Jeri said Joel's children were always excited to see her and vice versa. According to Jeri, Joel had a close relationship with his children and made it a priority for them to spend time with their paternal family. When asked to describe Taylor's personality, Jeri said she could be captivating and compelling and also goal driven and oriented, which Jeri found admirable. However, Jeri also said Taylor was not trustworthy and always liked change.

¶ 34    On December 3, 2024, the trial court issued a written order denying the petition. The court indicated it was required to consider the factors set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2024)) and determine whether the requested relocation was in the children's best interests. After reviewing the evidence presented and considering the statutory factors, the court found the move was not in the children's best interests. According to the court, one of its biggest concerns was Taylor, who the court found by a preponderance of the evidence was a "very controlling person who, when she does not get her way, reacts in a very violent, vicious, foul-mouthed, and retaliatory way." The court noted the primary reasons Taylor gave for relocating the children to South Carolina were the educational and recreational benefits available to the children there. The court did find the educational opportunities in Greenville were probably

better than in Macomb. However, while finding the educational opportunities were better, the court stated it appeared Taylor was "not looking to move the children to a better school district, but she is looking for reasons to justify her wanting to move to South Carolina in general." Further, the court wrote it did not believe the recreational opportunities for outdoor exploring were any better in Greenville than Macomb. While Taylor testified the children were happy during trips to South Carolina, the court viewed these visits as vacations, where children would be expected to enjoy themselves.

¶ 35        As for Joel, the trial court found he "exercised every opportunity he has had to visit with the children under the Parenting Plan, with the exception, of a few extra-curricular activities that they might have been participating in" because of the emotional strain he experienced when Taylor left him for Chad, and the fact he would have had to interact with Chad at these activities. Based on the court's observation of Joel during his testimony, the court found it "quite apparent *** that he is very attached to the children, loves them dearly, and would be very upset with their departure from his life." In addition, the court noted "it is abundantly clear *** the extended family is much more plentiful and involved in the children's lives in the Macomb/Pekin, Illinois[,] areas as opposed to the Greenville, South Carolina[,] area."

¶ 36        According to the trial court, Taylor's proposed schedule would adversely affect the relationship between Joel and the children. If the children were relocated to South Carolina, they would lose their ability to visit with Joel every weekend and their time with Joel would be impacted. Under Taylor's proposal, Joel would have less time with the children unless the children missed school and travelled extensively for four-day weekends. The court did not believe a reasonable and realistic parenting schedule could be implemented that would closely parallel the frequency and time Joel currently had with the children without impacting their school attendance.

Joel's parenting time would go from every weekend to sporadic visits a few times per year. The court stated any slight increase in the number of days Joel had with the children would not make up for the missed weekly visits. In addition, the court found the time spent traveling to Joel's visits would adversely impact Joel's relationship with the children and not be in the children's best interests. The court also found the move would impact the children's strong connections with Joel's extended family in Illinois and Wisconsin.

¶ 37    While the trial court recognized the technological potential for Joel's parenting time to be supplemented via telephone calls or video-communication applications, the court "believe[d] by the preponderance of the evidence that Taylor is too volatile to assure a regular and ongoing Facetime and/or telephone schedule with the children should she become dissatisfied with anything that Joel does with the children."

¶ 38    In addition, recognizing neither party filed a petition to modify the allocation of parental decision-making, the trial court noted Taylor and Joel would be required to make joint decisions regarding the children. Because of the distance between Illinois and South Carolina, Joel and Taylor would not likely be able to discuss issues about the children in person and would have to communicate with each other remotely. Considering the facts in this case, the court did not think Taylor could do this.

¶ 39    Finally, the trial court stated both parties appeared to recognize the children were too young to express any preference regarding the relocation.

¶ 40    This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42                        A. General Principles Regarding Relocation

¶ 43    When considering whether to grant a petition to relocate children, a trial court's

paramount concern is the children's best interests. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). The court's determination of what constitutes the children's best interests "cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Id.* at 326. The parent seeking to relocate the children bears the burden of proving the relocation is in the children's best interests. *Id.* at 325.

¶ 44        "[I]n determining what is in the best interests of a child, the circuit court should hear any and all relevant evidence." *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 522 (citing *Eckert*, 119 Ill. 2d at 326). "[T]he 'mere desire of the custodial parent to move to another State, without more, is insufficient to show that the move would be in the child[ ]'s best interest.' " *Id.* (quoting *Eckert*, 119 Ill.2d at 325). Children have an important interest in maintaining significant contact with both of their parents after a divorce. *Id.* That being said, the "interests of the custodial parent should not be automatically subordinated to those of the noncustodial parent in a removal action." *Id.* at 528. Our supreme court has emphasized "that because there is a nexus between the well-being of the custodial parent and the child who is in this parent's care, all benefits afforded to the child as a result of the move must be considered by the circuit court in making its best interests determination." *Id.*

¶ 45                                    B. Statutory Factors

¶ 46        Pursuant to section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2024)), the trial court shall consider the following factors in determining whether relocation is in a child's best interests:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests."

When determining whether a relocation petition should be granted, a court does not simply determine who won a majority of these enumerated factors. *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 71. Depending on the circumstances of a case, some factors may carry more weight than others. *Id.* "[T]he trial court must consider all factors and evidence touching on the

issue and must arrive at a reasonable result." *Id.* A court's decision whether to grant a petition to relocate is based on the circumstances in that particular case. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Because child relocation cases are so fact specific, comparing one court's relocation decision to another court's relocation decision is of little value. *Levites*, 2021 IL App (2d) 200552, ¶ 71.

¶ 47                              C. Standard of Review

¶ 48        Because these decisions are so fact specific, we will not disturb the trial court's ruling unless it is clearly against the manifest weight of the evidence and it appears a manifest injustice has occurred. *Fatkin*, 2019 IL 123602, ¶ 32. "A trial court's determination is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *Banister v. Partridge*, 2013 IL App (4th) 120916, ¶ 47. This deferential standard of review is appropriate because the trial court was able to observe the parties and is in a better position than this court to evaluate their personalities, capabilities, and temperaments. *Id.*

¶ 49                           D. Improperly Admitted Evidence

¶ 50        According to Taylor, the trial court's findings on the statutory factors were against the manifest weight of the evidence considering the evidence actually admitted. Several times in Taylor's brief, she states the court admitted and considered all of Joel's exhibits even though all the exhibits were not offered or admitted. Taylor argues her exhibit Nos. 1 through 8 were admitted by the court. However, she claims the court only admitted Joel's exhibit Nos. 7, 11, 18, 21, 22, 26, and 27. This is not correct.

¶ 51        It appears the trial court admitted Joel's exhibit Nos. 3, 4, 7, 10, 11, 13, 18, 21, 22, 23, 24, 25, 26, 27, 28, and 29. As Joel points out in his brief, toward the beginning of the hearing,

- 16 -

the court and the attorneys discussed how to handle his exhibits, which were in a binder. The court indicated it would take the entire binder with the understanding any exhibits in the binder not admitted would be removed from the binder. However, it appears exhibits that were not admitted were scanned into the record, including Joel's exhibit Nos. 1, 2, 5, 6, 8, 9, 12, 14, 15, 16, 17, 19, and 20.

¶ 52     Nonetheless, we see no reason to believe the trial court considered any of the exhibits that were not introduced as evidence. The court did specifically mention respondent's exhibits 18-20 in its written order. As noted above, respondent's exhibit Nos. 19 and 20 were not admitted into evidence. However, while the court mentioned these two exhibits, it does not appear from the record that it relied on them.

¶ 53     The trial court stated in its written opinion that respondent's exhibit Nos. 18-20 showed Taylor was "very vicious, vindictive, and [a] foul-mouthed mother, who, when she does not get her way, appears to retaliate and interrupt a calm and cooperative atmosphere between the parties." We note respondent's exhibit Nos. 19 and 20 did not demonstrate Taylor was vicious, vindictive, or foul-mouthed. However, Joel did introduce, and the court did admit exhibits, including respondent's exhibit Nos. 7, 10, and 18, which support the court's finding regarding Taylor.

¶ 54     Respondent's exhibit No. 7 was comprised of e-mails from late 2016, which contained numerous curse words between Taylor and Chad. Taylor told Chad she would make his life "a living h***" if he ever tried to see L.V. or be a part of his life. She also told Chad, "You have no idea what I am capable of, especially when it comes to protecting my son."

¶ 55     In respondent's exhibit No. 10, which was a text message exchange between Taylor and Joel, Taylor messaged Joel, "Get your a*** back here to watch the f*** [*sic*] kids and talk

about online divorce or Chad and I I'll [*sic*] contact a lawyer and you'll never see [L.V.] again." Joel responded that Taylor was not going to take his son away from him. Later, during this exchange, Taylor wrote:

> "We're done. Get back here and let's calmly lay out divorce. We're not doing this to our kids any more. And you will not trap me in a marriage I don't want to be in.

> Who does that?? That's like raping someone. Forcing them in a marriage they don't want. F*** someone when they don't want it. Same thing."

¶ 56 Finally, respondent's exhibit No. 18 was a text message exchange between Taylor and Joel that was three pages in length. Taylor messaged Joel that he would be receiving a 60-day notice she and the children were moving. According to Taylor, Joel could either agree to the move or she would take him to court, ask for more child support, and ask for a modified parenting plan, where he would get less time with the children. Taylor also told Joel he would be paying $20,000 in attorney fees if he wanted to fight her petition to relocate the children.

¶ 57 We conclude the record supports the inference that the trial court's reference to respondent's exhibit Nos. 19 and 20 in the court's written order was simply a drafting error and not proof the court considered information that had not been admitted as evidence. Furthermore, because the unadmitted exhibits mentioned by the court do not appear to have been relied on by the court and considering the record contained admitted evidence supporting the court's finding in question, it does not appear Taylor was prejudiced by the error.

¶ 58 E. Trial Court's Decision Denying Relocation

¶ 59 We now turn to the remainder of Taylor's argument the trial court erred in denying her petition to relocate the children. Taylor does not challenge the court's findings that (1) Joel

had valid reasons for objecting to the petition and (2) the children had close relationships with extended family in Illinois and Wisconsin (3) but not in South Carolina, other than (a) their maternal grandparents—who had just moved there on a part-time basis—(b) and Chad—who had only recently moved to South Carolina and was working as a school administrator. The parties also agree the children were too young to express a preference as to whether they wanted to stay in Illinois or move to South Carolina.

¶ 60 Considering the deferential standard of review in this case and the trial court's findings, we cannot say the court erred in denying the petition to relocate. Taylor spends a substantial amount of time in her brief arguing the relocation petition should have been allowed for the following reasons: (1) a reasonable parenting schedule could have been implemented; (2) her visitation proposal provided Joel nearly the same amount of time he currently had with the children; (3) the children would not be negatively impacted by the move because they would have nearly the same amount of in-person time with Joel and could also communicate with Joel via telephone and/or video communication applications like FaceTime; (4) Joel did not take advantage of all of his opportunities to be with the children under the current parenting plan because he had not taken advantage of the vacation time he was allowed; (5) Joel did not attend school events, parent-teacher conferences, or the children's doctors' appointments in Illinois; and (6) she and Joel did not make joint parenting decision by communicating in person in Illinois and joint decision making with her in South Carolina and Joel in Illinois would be no different than their current process.

¶ 61 However, even assuming, *arguendo*, a reasonable parenting schedule could be implemented and Joel would have the same amount of days with the children as he does now, the trial court's finding the children would be impacted by the move is not against the manifest weight

of the evidence. While the evidence showed Joel did not take advantage of the vacation time he was allowed with the children every summer, the record is clear Joel was very involved in the children's lives. Under the current parenting plan, Joel had the children every weekend, during which he could focus on the children and not have to go to work. If the children were relocated to South Carolina, the frequency of their time with Joel would significantly decrease. Further, while their time with Joel would be longer, the children would not have access to their father while he was working Monday through Friday at his full-time job.

¶ 62        Granted, our supreme court has agreed with the proposition "the interests of the custodial parent should not be automatically subordinated to those of the noncustodial parent in a removal action." *Collingbourne*, 204 Ill.2d at 528. Further, "[t]he best interest of children cannot be fully understood without also considering the best interests of the custodial parent." *Id.* While it is in the best interest of children to have a close and healthy relationship with both parents, a reduction in the amount and/or quality of the parenting time the noncustodial parent will receive if a relocation petition is granted is "merely one factor to consider" in deciding how to rule on a relocation petition. *In re Marriage of Ludwinski*, 312 Ill. App. 3d 495, 501-503 (2000).

¶ 63        In other words, relocation should not be denied simply because the non-custodial parent will receive less visitation time with his or her children. The importance of a reduction in the quality or quantity of the noncustodial parent's visitation "can be determined only within the context of the facts of the particular case." *Id.* at 503. For example, the existence of an extremely close relationship between children and their noncustodial parent is an important factor for a trial court to consider in deciding whether to allow children to be relocated. *Id.* at 502.

¶ 64        As noted earlier, children have an important interest in maintaining significant contact with both of their parents after a divorce. *Collingbourne*, 204 Ill. 2d at 522. Therefore, "the

'mere desire of the custodial parent to move to another State, without more, is insufficient to show that the move would be in the child[ ]'s best interest.' " *Id.* (quoting *Eckert*, 119 Ill. 2d at 325).

¶ 65 Further, when considering the reasons Taylor claimed she wanted to relocate to South Carolina, the trial court recognized the educational opportunities in Greenville are probably better than in Macomb. However, the court disagreed that the opportunities for recreational exploring are better there. In addition, the court did not believe the proposed move to Greenville was truly motivated by Taylor's desire to get the children into a better school district. Instead, the court stated it appeared Taylor was "looking for reasons to justify her wanting to move to South Carolina in general." We note the court was in a better position to judge Taylor's credibility than this court.

¶ 66 Taylor challenges the trial court's finding and argues the court earlier provided a contradictory statement that "[i]t is abundantly clear to the court that the primary reason for Taylor's wanting to relocate to Greeneville [*sic*], South Carolina[,] is the educational and recreational opportunities that are presented to the children in that area." We recognize the court's two findings appear facially contradictory. However, considering the context of the court's entire order, it appears clear the court was simply stating Taylor was attempting to justify the relocation to the court by saying the primary reasons for the relocation were the educational and recreational opportunities available to the children in South Carolina.

¶ 67 Additionally, Taylor takes issue with the trial court's comments regarding her failure to investigate other school districts in Illinois that could have provided better educational opportunities than the schools in Macomb. She argues the trial court should only have considered her reasons and motives for relocating the children to South Carolina, not whether closer potential alternatives existed. However, Taylor's failure to investigate better educational opportunities

closer to Macomb challenged the credibility of her assertion she wanted to move to Greenville because the educational opportunities were better there. If Taylor's decision to move was primarily based on her desire to improve the children's education, she did not have a good reason to take the children all the way to South Carolina, away from Joel, if better schools could be found in or closer to central Illinois.

¶ 68     Based on the facts in this case, we cannot say the trial court's denial of Taylor's petition to relocate is against the manifest weight of the evidence. It was Taylor's burden to establish the relocation was in the children's best interests. See *Eckert*, 119 Ill. 2d at 325. Taylor failed to do so. She did not establish a valid reason why the move, far from the children's father, was in the children's best interests. Further, she did not attempt to establish Joel was trying to control her life through the children. This is not a case where Taylor was in a relationship with someone from and with extensive ties to South Carolina that could provide her and the children a better quality of life there. Taylor had married L.V.'s biological father, who was a school administrator in west-central Illinois. In addition, she did not even attempt to show the move was about better employment opportunities for herself and/or her current husband.

¶ 69     In short, it appears the trial court concluded this was a situation where Taylor merely wanted to move to the Greenville area because she would like it better there than Macomb. However, her mere desire to move to South Carolina is not sufficient to establish the move was in the children's best interests considering the children's relationship with Joel, who was very involved in the children's lives and had parenting time with them every weekend. Based on the court's observations of Joel's testimony, the court found Joel loved the children dearly and was very attached to them. Further, the court indicated the children's loss of weekly visits with Joel would adversely affect them because they were close to Joel and enjoyed many social activities

with him and his surrounding family. Finally, even assuming, *arguendo*, Taylor had established valid and credible reasons why the move to Greenville would be in the children's best interests, the negative effects of Taylor's behavior on the children's relationship with Joel and Joel's extended family would still weigh against allowing the children to move to South Carolina based on the facts in this case. Accordingly, we cannot conclude the trial court's denial of Taylor's petition to relocate is against the manifest weight of the evidence.

¶ 70                                III. CONCLUSION

¶ 71        For the reasons stated, we affirm the trial court's judgment in this case. Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), the deadline for this court to file its decision in this case was June 23, 2025. However, Rule 311(a)(5) provides this court with the ability to extend the deadline for good cause. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). We have done so in this case.

¶ 72        Affirmed.